## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

MOHSEN MOSLEH
8701 Bradmoor Drive
Bethesda, Maryland 20817

                    *Plaintiff*,

        v.

HOWARD UNIVERSITY
2400 6th Street, NW
Washington, DC 20059

                    *Defendant*.

Civil Case No. _____

## COMPLAINT

Plaintiff Mohsen Mosleh, Ph. D ("Dr. Mosleh") by his undersigned counsel, for his

Complaint against Defendant Howard University ("Howard University") states as follows:

## INTRODUCTION

1.      This is a civil action against Howard University seeking monetary relief for injuries

Dr. Mosleh suffered as the result of the discrimination and retaliation to which he was subjected

by Howard University, in violation of the D.C. Human Rights Act ("DCHRA") D.C. Code § 2-

1402.11, *et seq*., and from Howard University's breach of Dr. Mosleh's employment contract.

Prior to his unlawful demotion, Dr. Mosleh was the Acting Associate Dean for Research and

Graduate Education at Howard University's College of Engineering and Architecture ("CEA"),

where he was the highest-ranking Iranian-American professor. At all times relevant to this action,

Dr. Mosleh has been a tenured professor at Howard University and has earned less than the

minimum Institutional Base Salary ("IBS") for a comparable tenured full professor in the CEA.

2.      Howard University has condoned a culture of professional retaliation that is nearly unheard of in institutions of higher education.  Howard University was well aware that Department Directors and Deans had a long history of retaliating against faculty members, as the university's Faculty Senate authored a formal letter on March 31, 2017 detailing "gross incompetence" and "evidence of intimidation of faculty by Deans," upon which Howard University has refused to act. In response to Howard University's attacks on professors' tenure, faculty demotions, retaliatory pay cuts, and mismanagement of funds, on April 2, 2018, the faculty passed a historic vote of "no confidence" in Howard University's President, Provost, executive committee of the Board of Trustees, and Chief Operating Officer, making clear that Howard University had "failed to develop a system of evaluation of deans and directors, which [the President] promised five years ago, resulting in a climate of fear of retaliation and intimidation on campus."  Long on notice that it had created an environment that all but encouraged unlawful retaliation, Howard University chose to ignore complaints made by Dr. Mosleh and others.

3.      Howard University, a historically African-American university, knew that Dr. Mosleh had raised multiple formal complaints alleging race and/or national origin discrimination and retaliation to President Wayne A.I. Frederick and Provost Anthony K. Wutoh of Howard University regarding Dean Achille Messac of the CEA and Graduate Director Gbadebo Owolabi. Dr. Mosleh is the only tenured professor of Iranian descent in the Department of Mechanical Engineering. Dr. Mosleh holds a Ph.D. from the Massachusetts Institute of Technology ("MIT"), is the author of numerous peer-reviewed journal articles, holds four of Howard University's total of 51 patents, and has produced over 27% of Howard University's successful candidates for Master's and Ph.D degrees in mechanical engineering over the past twenty years, and has been the Principal Investigator (PI) or co-PI for research grants and contract awards.  For his outstanding

research and teaching and graduate education achievements, Dr. Mosleh has received the "Faculty Exemplar Medal" from the Graduate School at Howard University, the "Outstanding Faculty of the Year Award" twice from the student section of American Society for Mechanical Engineers ("ASME"), and the section "Outstanding Teaching Award" from the American Society for Engineering Education ("ASEE").   Despite his superior qualifications, since achieving full professor in 2009, Dr. Mosleh had earned between $13,000 and $17,000 less in IBS than the minimum IBS of comparable tenured full professors of engineering in the CEA.   Despite his promotion to acting Associate Dean for Research and Graduate Education accounted in May 2016, Dr. Mosleh's base compensation was $35,000-$45,000 less than that of the other acting Associate Dean for Academic Affair in CEA, Dr. Moses Garuba, per Howard University IRS Form 990, and the acting Dean Associate Dean for Research and Graduate Education Dr. Kimberly Jones who replaced Dr. Mosleh after his unlawful demotion.   All three acting Associate Deans had equal years of employment at Howard University, i.e. approximately 20 years, and were promoted to the rank of Professor in 2009.   But, Dr. Mosleh had produced more patents and PhD students of the other two combined.   Rather than acknowledge Dr. Mosleh's complaints of discrimination, Howard University allowed his supervisors to punish him.

4.       On May 2, 2016, Dr. Mosleh was named the Acting Associate Dean for Research and Graduate Education at the College of Engineering, a promotion for which he was guaranteed an annual stipend of $15,000.   Dr. Mosleh was set to begin his new role on July 1, 2016, under the supervision of Dean Messac. But beginning on May 2, 2016, Dean Messac demanded that Dr. Mosleh complete between ten to twelve hours of clerical tasks each day, none of which had anything to do with his role as Acting Associate Dean.   Dr. Mosleh insisted on being paid for that work, which made it impossible for him to meet his obligations to the Boeing corporation, which

had long funded Dr. Mosleh's research pursuant to a prestigious private grant. Accordingly, on or about June 22, 2016, Howard University agreed to pay Dr. Mosleh $31,815 as a summer salary to compensate for his loss of private income. One day later, Dean Messac reneged on that promise, demanding that Dr. Mosleh charge his clerical work for Howard University to the Boeing contract. On August 12, 2016, Dr. Mosleh objected to Dean Messac's unethical demand: as Dr. Mosleh made clear, he "had nothing to report" to Boeing about research he had never performed and falsifying his time put Howard University in violation of the Effort Certification Policy ("ECP") at Howard University and corresponding federal laws. Dean Messac retaliated almost immediately, revoking Dr. Mosleh's deanship on August 16, 2016 and refusing to provide his guaranteed stipend. On August 28, 2016, Dr. Mosleh filed a formal grievance with the Provost alleging retaliation, unlawful demotion, and breach of contract. Howard University took no action.

5.      Instead, after allowing Dr. Mosleh to be unlawfully demoted, Howard University endorsed a continued campaign of retaliation against him. With the full knowledge of the President and Provost, Dean Messac stripped Dr. Mosleh of his title of Campus Representative for the American Society for Engineering Education and denied him a promotion as Chair of the Department of Mechanical Engineering. Dr. Mosleh had no choice; on April 5, 2017, he filed suit against Howard University in the District of Columbia Superior Court. In response, Dean Messac, Chair Yilmaz, and Director Owalobi retaliated yet again, forcing Dr. Mosleh to teach courses outside of his field of surface engineering, denying funding to his graduate students, rejecting his request for sabbatical, and ultimately removing Dr. Mosleh, Howard University's highest producer of students with Master's degrees and Ph.Ds. in mechanical engineering, from teaching courses at the graduate school. His health deteriorating and his professional reputation destroyed, Dr. Mosleh

continued to seek Howard University's help by requesting hearings and committee interventions. Howard University did nothing.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Plaintiff's claims pursuant to U.S.C. §1332, as the parties are diverse and the amount in controversy exceeds $75,000. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to U.S.C. § 1367(a).

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b), as Defendant is a resident of the District of Columbia and a substantial number of the events, acts, or omissions giving rise to Plaintiff's claims occurred in the District of Columbia.

## PARTIES

8.      Dr. Mosleh is an adult, Iranian-born male and a resident of Maryland.  Dr. Mosleh has been a tenured professor at Howard University since 2009. Dr. Mosleh is an employee within the meaning of the DCHRA, D.C. Code § 2-1401.02(9).

9.      Defendant Howard University is a nonprofit, private university located in the District of Columbia. Defendant is an employer within the meaning of the DCHRA, D.C. Code § 2-1401.02(10). For the purposes of this Complaint, the President and Provost of Howard University are referred to as "the Administration."  At all times relevant to this Complaint, Howard University exercised oversight and control over the conduct of its employees, including the Administration, Deans, and Directors, who had the authority to hire, discipline, and terminate professors, including Dr. Mosleh.

## STATEMENT OF FACTS

### I.   Dr. Mosleh's Reports of Discrimination

10.    Dr. Mosleh has dedicated his entire career to Howard University, where he has been a professor and researcher in the field of mechanical engineering, specializing in surface and interface science and engineering ("SISE"), since he was hired 1996.  Dr. Mosleh has always stood out at the private, historically African-American institution.  Dr. Mosleh is one of the top five patent holders and inventors at Howard University and one of the top two patent holders and inventors in the CEA, holding four patents while Howard University holds 51 total patents.  Dr. Mosleh founded Howard University's renowned Surface Engineering and Nanofluids Laboratory ("SENL"), where he has supervised the research of 27% of all graduate students in the Department of Mechanical Engineering during the past twenty years, who apply his techniques to reduce surface degradation to projects for the automotive, aerospace, biomedical, chemical, construction, and textile industries.  Doctoral and Master's graduate who conducted research in SENL under Dr. Mosleh's supervision have assumed leadership roles in academia, industry and government agencies.  Dr. Mosleh also stands out an admired teacher by Howard University's mechanical engineering students who awarded him "Outstanding Faculty of the Year" twice in 1998 and 2005.  Dr. Mosleh stands out for another reason: he was born in Iran and speaks with a heavy Iranian accent.

11.    Dr. Mosleh first realized he was the victim of race and/or national origin discrimination in 2009, when he achieved full tenure and received a base salary of $80,099. In 2009, the minimum base salary for a professor of mechanical engineering was $96,673.  When Dr. Mosleh attempted to negotiate higher pay, Howard University refused to match Dr. Mosleh's salary to that of every other tenured professor at the College of Engineering— and refused to

explain its decision.  Dr. Mosleh reasonably believed he was being paid less because he is Iranian. To that end, in 2010, Dr. Mosleh wrote a letter to the Administration, alleging discriminatory pay practices.  Howard University ignored his letter.  From 2009 to 2013, Howard University continued to pay Dr. Mosleh between $14,000 and $17,000 less than every other tenured professor at the College of Engineering; from 2014 to 2017, he was paid between $13,000 to $15,000 less than his colleagues.  This low IBS reduced the amount of summer salary that Dr. Mosleh could charge to his grant accounts by $4,666-5,666 per year. It also reduced the employer's 8% retirement contribution for Dr. Mosleh by $1,120-1,360 per year.  During 2004-2017, the low IBS reduced the amount of summer salary that Dr. Mosleh could charge to his grant account by $4,333-5,000 per year.  It also reduced the employer's 8% retirement contribution for Dr. Mosleh by $1,040-1,200 per year.

12.     It was not that Howard University had no notice of Dr. Mosleh's allegations; the opposite was true.  On August 7, 2012, Dr. Mosleh wrote a second letter to the Administration: "My salary has been discriminately compressed despite an outstanding academic and scholarly performance compared with peers in the department, school, and College [of Engineering.]" The Administration responded on the same day, stating it planned to discuss this with the Dean of the College of Engineering. In the end, Howard University did nothing.  Dr. Mosleh tried again in 2013, addressing a letter explaining his unfair pay directly to the Dean of Engineering.     But Howard University did nothing. At all times relevant to this Complaint, Dr. Mosleh has earned less than any other comparable tenured professor of engineering at the CEA.

## II.     The First Act of Retaliation

13.     On May 2, 2016, Dr. Mosleh was named the Acting Associate Dean for Research and Graduate Education, pursuant to a new contract with Howard University, under which he was guaranteed an annual stipend of $15,000.  Howard University did not increase Dr. Mosleh's base salary. Dr. Mosleh would be supervised by Dean Messac and was required take on his role beginning July 1, 2016.

14.     Beginning on May 2, 2016, Dean Messac demanded that Dr. Mosleh complete ten to twelve hours of clerical tasks each day, in addition to his own academic research.  Dr. Mosleh objected: the work was "completely unrelated [] to the research and graduate education" he had been hired to perform. Dr. Mosleh further advised Dean Messac that his Boeing research commitments made it impossible for him to continue working 12-hour days for Dean Messac. Since October 1, 2015, the Boeing corporation had funded Dr. Mosleh's research project entitled "Metal Working Fluids for Incremental Sheet Forming."  Pursuant to the terms of the two-year contract between Boeing, Dr. Mosleh, and Howard University, Dr. Mosleh was required to report his research results directly to Boeing. Dean Messac insisted that Dr. Mosleh complete the clerical tasks, regardless.

15.     On June 3, 2016, Dr. Mosleh met with Dean Messac and insisted that he be compensated for his work.    Dean Messac guaranteed that Howard University would pay Dr. Mosleh a summer salary of $489.46 per diem, based on his nine-month salary of $95,446, if he promised to complete Dean Messac's clerical tasks through the third week in June. Dr. Mosleh agreed to do so.  On June 22, 2016, Dean Messac emailed Dr. Mosleh to confirm that Howard University had "set up a one-month summer payment."

16.    On June 22, 2016, Dr. Mosleh was also notified that he had been awarded a new Boeing contract. Dr. Mosleh forwarded the email confirmation of his new Boeing award to Dean Messac on June 23, 2016 and thanked Dean Messac for his "email about the one-month pay." Dr. Mosleh reminded Dean Messac: "It will take a few more weeks before a [grant] account is created and the funds could be used." Ever cognizant of his ethical obligations, Dr. Mosleh noted: "I wanted to make sure there is nothing undeclared here!" Dr. Mosleh assumed that Dean Messac would honor his obligations and pay his summer salary from university.  Dr. Mosleh was wrong.

17.    On June 23, 2016, Dr. Mosleh, Dean Messac, and CEA budget officer, Ms. Esther Peace, participated in a conference call in which Dean Messac asked Ms. Romaine Peace if his Boeing contract contained sufficient funds to pay Dr. Mosleh one-month salary.  Dr. Mosleh responded that it did but it would be improper for him to be paid from that account.

18.    Dean Messac then asked Dr. Mosleh to continue to perform ten to twelve hours of clerical work each day through mid-August. Dr. Mosleh had no choice; he agreed to undertake the clerical tasks on the condition that Howard University would continue to pay his per diem salary. Dr. Mosleh also informed Dean Messac that he continued to believe he was the victim of discrimination, given Howard University's initial hesitation to compensate him for his summer work and his ever-inferior annual base salary.

19.    Dean Messac agreed that Howard University had been unfair to Dr. Mosleh.  On June 25, 2016, Dean Messac confirmed their prior discussion via email: "I fully understand and am troubled by the salary structure. You are grossly underpaid; surely as an associate dean!"

20.    Accordingly, in July of 2016, Dean Messac promised Dr. Mosleh in person that Howard University would pay him $31,815 to work from May 14, 2016 through August 14, 2016.

But unbeknownst to Dr. Mosleh, Dean Messac had already decided to bill the Boeing corporation for Dr. Mosleh's work instead.

21.     On July 15, 2016, Dean Messac's assistant, Esther Peace, emailed the Office of Grant Management at Howard University, asking to pay Dr. Mosleh's $31,815 summer salary from his Boeing grant fund.  On August 1, 2016, Ms. Retland responded and copied Dr. Mosleh: Ms. Peace's request for release of the Boeing funds had been "submitted and approved."

22.     Dr. Mosleh objected immediately; pursuant to federal law and Howard University's internal regulations, he was required to certify that he had performed research for Boeing before he could be paid from the Boeing funds. Just like any other corporation that accepts federal funding, Boeing is subject to strict federal regulations that require researchers to certify any work they perform for the company.  Accordingly, Howard University has strict ethical standards for professors who undertake sponsored research.  According to its Effort Certification Policy, Howard University professors must submit signed paperwork with "an endorsement by the employee that, to the best of his/her knowledge, the salary charges accurately reflect the effort distribution across all activities for the period of time in question."  Dr. Mosleh refused to certify that he had performed research for Boeing when he had not.

23.     On August 12, 2016, Dr. Mosleh emailed Dean Messac and Dr. Moses Garuba, the Associate Dean for Academic Affairs at the College of Engineering.  Dr. Mosleh was clear: "I have worked on a 12-hour daily work schedule" to perform "secretarial… and administrative actions" for Dean Messac, "despite being 100% paid by my research contract during May 16-August 15" [sic]. Further, "[t]hese activities have left me no time whatsoever… to fulfill my obligations to my research contracts." Accordingly, "[f]or the first time in ten years, I will have nothing to report to [Boeing] on our planned August 25 conference call.  This is jeopardizing my

credibility and scholarship future." Dr. Mosleh made plain his objection to being paid from the Boeing grant fund: Dean Messac must "not [] force others to break the ethical standards such as those required in conduct of sponsored research."

24.     On August 12, 2016, Dean Messac responded to Dr. Mosleh, copying Dr. Garuba: "the following comments are strongly inappropriate: the attention not to force others to break the ethical standards such as those required in conduct of sponsored research." He suggested: "Let's continue this discussion in person." Those discussions went nowhere

25.     Instead, on August 16, 2016, Dean Messac retaliated against Dr. Mosleh by demoting him for reporting that he was the victim of discrimination and/or for refusing to breach ethical and legal standards. Dr. Mosleh was notified that he had been demoted when Dean Messac emailed the entire CEA to advise the community that Dr. Mosleh had been replaced as Acting Associate Dean of Research and Graduate Education, "effective immediately." Dean Messac implied that Dr. Mosleh would "be returning to the College of Engineering to continue his academic research" by choice. The opposite was true. Over his objection, Dr. Mosleh had been stripped of his title of Acting Associate Dean.

26.     On August 28, 2016, Dr. Mosleh filed a formal complaint with the Administration detailing Dean Messac's retaliation: "I am submitting a grievance against Dean Achille Messac for removing me from the position of Acting Associate Dean of Research and Graduate Education." As Dr. Mosleh pointed out, he was "not paid for work performed during the summer of 2016" and had worked unpaid for three months "only for Dean Messac to then request that I pay myself from the Boeing contract." Dr. Mosleh informed the Administration that, "while $31,815 was requested to be paid from the Boeing contract, the numerous tasks and assignments assigned to me by Dean Messac did not leave me time to work during summer 2016 on the Boeing

contract. The charge off is therefore inappropriate, afoul of internal Howard University policies and…. has the effect of damaging my professional reputation." Dr. Mosleh was clear: "It is also illegal." Dr. Mosleh advised that was considering taking legal action; "[t]his retaliatory removal therefore may also be afoul" of federal and District of Columbia law.

27.     As the Administration was well aware, professors at Howard University had been required to certify their research for "sponsored awards" regardless of the source of funding. In fact, Howard University had required Dr. Mosleh to certify his paid efforts during 2011-2015 for his several sponsored awards from The Boeing Company.  Howard University had demanded Dr. Mosleh that "Federal regulations, and Howard policy, require individuals that have salary allocated to sponsored awards to certify their effort periodically.  Our system certifies effort on a quarterly basis. We must achieve 100% compliance for the quarter so your prompt response is appreciated." As Dr. Mosleh pointed out in his letter, he "was acting as [a] whistleblower." The Administration never wrote back.

28.     After being put on notice by Dr. Mosleh that he intended to file legal claims against Howard University, it only allowed the retaliation to continue.  On October 4, 2016, Dr. Mosleh again emailed the Administration to request a formal review of his salary and reiterating his belief that he was the victim of pay discrimination.  The Administration responded on October 10, 2016, for the first time suggesting that Dr. Mosleh should address his concerns directly with Dean Messac: "adjustments to faculty compensation" must be "recommended through the Dean" of the College of Engineering.

29.     Accordingly, on October 13, 2016, Dr. Mosleh emailed Dean Messac, reminding him that "[a]ssistant and Associate Professors who have been hired in the College of Engineering have a higher Institutional Base Salary than mine" and that "this letter follows several similar ones submitted through the chain of command… since my promotion to Full Professor in 2009."  Dean Messac, who had previously agreed that Dr. Mosleh was "grossly underpaid" and suggested that he was "troubled by the salary structure" at Howard University, declined to respond.

30.     On October 13, 2016, Dr. Mosleh again emailed the Administration "to inquire whether and when a response to my complaint letter of 8/28/16 will be provided." The Administration responded on October 14, 2016; Howard University was "awaiting some additional information." The Administration never wrote back again.

31.     To date, Howard University has never addressed Dr. Mosleh's complaint of retaliation by Dean Messac.

32.     Howard University has also never fully paid Dr. Mosleh his guaranteed $15,000 stipend for his work as Acting Associate Dean. Over his objection, Dr. Mosleh was paid his $31,815 summer salary from the Boeing funds.

### III.     Howard University Endorses a Continuing Campaign of Retaliation

33.     On December 6, 2016, Dr. Mosleh asked Dean Messac to reconsider his teaching assignment for the upcoming spring semester.  Dean Messac had assigned Dr. Mosleh 9 teaching hours including undergraduate laboratory classes in solid mechanics, which he had never taught in his twenty years at Howard University.   Dr. Mosleh has no teaching experience in solid mechanics; his field of expertise is manufacturing and design.  Dr. Mosleh had also requested a lighter course load from Dean Messac in order to dedicate his time to the Boeing contracts. Dean

Messac had agreed that Dr. Mosleh needed time to allocate to his Boeing contract in the fall semester before he filed his retaliation grievance.

34.     On December 16, 2016, Dean Messac emailed Dr. Mosleh: "I have reviewed your teaching assignment and find it appropriate." In a separate email on the same day, Dean Messac for the first time advised Dr. Mosleh that he had been removed from his position as Campus Representative for the American Society of Engineering Education ("ASEE"), which he claimed was effective "several months ago."  Well aware that Dr. Mosleh had dedicated substantial time to the ASEE role for the past "several months," Dean Messac feigned concern: "I hope you were informed."

35.     On December 17, 2016, Dr. Mosleh made clear that he had not been: "During May 28-December 16, I carried out numerous activities/tasks as the ASEE CR without being informed that the role and its privileges had already been taken away from me despite our prior agreements." The ASEE itself confirmed as much; Dr. Mosleh later won the ASEE Award for Outstanding Campus Representative for his work from May through December of 2016. Dr. Mosleh further noted that Dean Messac's approval of his "highly demanding teaching schedule" for the spring semester represented a "change of decision."  Dr. Mosleh was clear: "These seem [to be] punitive actions."

36.     On January 25, 2017, Dean Messac announced recipients of faculty stipend awards based on faculty "work" in service, research expenditures, Ph.D. graduations, publications, and reaching Fellow rank.  Dr. Mosleh had excelled in all these categories and achieved (i) becoming a Fellow of the American Society of Mechanical Engineers (ASME), which was announced on the University Website on November 28, 2016 as "HOWARD UNIVERSITY PROFESSORS RECEIVE DISTINGUISHED ENGINEERIGN AND PHYSICS AWARDS, (ii) graduating Ph.D.

14

recipient K.A.S, (iii) was issued two patents and other publications, one of which presented at the ASEE Mid-Atlantic Conference in Baltimore, MD,  April 7-8, 2016 received "THE BEST PAER AWRD", and (iv) and performed significant services such as College APT Chairman and Provost research council member, all during the performance period specified by Dean Messac.  Based the specified criteria, he was eligible for $15,000-$20,000 stipend.  Dr. Mosleh received no stipend.

37.     On February 15, 2017, the Howard University again asked Dr. Mosleh to certify that he had worked on the Boeing contract from May through August of 2016. Dr. Mosleh had no choice; his refusal to do so put Howard University at risk of losing federal funding entirely. Dr. Mosleh completed the requisite Effort Certification but reiterated his August objection to the unethical allocation of funds: "For $31,815, a letter to Provost Wutoh was submitted on 8/29/16." As Dr. Mosleh truthfully noted, he had completed the work for Boeing, but not during the time period for which the Boeing fund had been charged: "Approximately, 520 hours were spent on weekends and after work hours after 8/16/16 to the required tasks per Contract Agreement to satisfaction of Sponsor per site visit on 1/13/17."

38.      In February of 2017, Dr. Mosleh learned that Dean Messac had eliminated Dr. Mosleh from consideration for the position of Chair of the Department of Mechanical Engineering at the College of Engineering. Dr. Mosleh was qualified for the promotion; to ensure he did not get it, Dean Messac had violated the established rules and procedures outlined by the Howard University Faculty Handbook.

39.     On March 1, 2017, Dr. Mosleh filed an official grievance with the Faculty Grievance Commission (FGC) detailing Dean Messac's multiple violations of Howard University's rules and procedures governing the processes by which candidates for administrative positions are selected.

40.     On March 3, 2017, the FGC agreed with Dr. Mosleh: his allegation of misconduct against Dean Messac "appears to be credible." Further: "The conditions of the search process outlined in your letter appear to be in violation of the established rules and procedures." However, as the FGC pointed out, only one of Dr. Mosleh's allegations was "under the purview of the FGC," while his other two allegations "violations of the Standard II of Middle States Commission on Higher Education." were not under the purview of the FGC.  The successful candidate had already been chosen; Dr. Mosleh received no further response from Howard University.

41.     On March 31, 2017, Howard University's Faculty Senate wrote a formal letter detailing "gross incompetence" and "evidence of intimidation of faculty by Deans," upon which Howard University had refused to act.

42.     On April 5, 2017, through his prior counsel, Dr. Mosleh filed suit against Howard University in the District of Columbia Superior Court, seeking damages for discrimination and unlawful demotion, plead as a claim for unlawful discharge.  The suit was later withdrawn by Dr. Mosleh on November 15, 2018 without prejudice.

43.     In May of 2017, Dr. Mosleh graduated a Ph.D. candidate Mr. K.B. Dr. Mosleh was one of only six faculty members in the College of Engineering to graduate Ph.D. candidate in the spring semester.

44.     On July 31, 2017, Dean Messac congratulated "colleagues for their fabulous performances" and announced faculty recipients of "stipend" in an email to the CEA faculty.  Dr. Mosleh was named in the "Six CEA PhD Graduates AY16-17: Dr. Mohsen Mosleh ME…With a [$5,000] stipend, in line with the CEA pertinent announcement." for producing PhD recipient Mr. K.B. in May 2017.  Dr. Mosleh never received the stipend.

45.    On May 25, 2017, Dr. Mosleh was diagnosed with shingles, brought on by stress, for which he sought medical treatment.

46.    Dr. Mosleh had already committed to teaching a full course load in fall of 2017, but the campaign of retaliation by Howard University had taken a toll.  His psychological and physical health deteriorating, Dr. Mosleh requested sabbatical leave for spring of 2018 to focus on research and writing.

47.    On September 19, 2017, Dean Messac informed Dr. Mosleh that the Administration had denied his request for sabbatical.  In his twenty years of teaching at Howard University, Dr. Mosleh had never requested sabbatical leave, but he was eligible to receive it 3 times during 1996-2017.  Another comparable faculty of engineering was granted leave/sabbatical leave by the Administration in 2017.  This faculty member had already received leave/sabbatical leave three prior times during 1996-2017.

48.    On January 4, 2018, Dr. Mosleh submitted a request for tuition waiver for two graduate students to the Office of Vice President for Research at Howard University, pursuant to a collaborative research proposal he had designed with Northwestern University entitled "Materials Informatics for Digital Manufacturing and Design ("MIDMD")." The proposal would be submitted to the National Science Foundation ("NSF") and envisioned developing "an innovative, multi-institute NSF program to train Ph.D. and M.S. students" in the specialized field of digital manufacturing and design. As Dr. Mosleh noted, Northwestern University had already committed several tuition waivers for graduate students, and Dr. Mosleh asked that Howard University do the same for two graduate students, as the two trainees' required stipend "leaves no budget for tuition" for the students.

49.     On January 11, 2018, Ms. Retland from the Office of Vice President for Research at Howard University responded: Dr. Mosleh would need to ask Dean Messac "regarding support that can be provided for this proposal." Considering that Dean Messac had denied tuition and stiped support for Dr. Mosleh's Ph.D. students in 2017 and 2018, Dr. Mosleh submitted the NSF proposal without requesting two tuition waivers from Dean Messac. The proposal was not funded.]

50.     On March 5, 2018, Dr. Mosleh was informed that Howard University had "informally resolved" a gender discrimination complaint a graduate student had filed against him. Dr. Mosleh was well aware of the student's complaints, which were baseless. The student had dropped his course after receiving a 50% and a 10% on the two quizzes he had administered before alleging that she was given insufficient time to complete one of them. But Howard University's mandate was clear: Dr. Mosleh would "be excused from participating in any part of Ms. A.M. academic activities at Howard University, including candidacy exams and/or thesis defense committee."

51.     On March 25, 2018, Dr. Mosleh wrote back to Dean Messac and the Administration: the decision was bereft of "any reference to your findings on the merits" of the student's complaint, and Dr. Mosleh never before in his career been faced with an allegation of gender discrimination. Dr. Mosleh was shocked by Howard University's response: the "email below suggest[s] that you will remove me from teaching graduate courses and other graduate education services in the coming year/s" based on a single student's unsupported allegations. Further, Dr. Mosleh had been entirely removed from being an examiner in required graduate course/s in doctoral candidacy exams since Spring 2018 and has been denied access to information regarding the graduate program activities in mechanical engineering.

52.     In March of 2018, Dr. Mosleh began seeking psychological care for stress, anxiety, and depression brought on by his treatment by Howard University. He continues to visit a psychologist regularly.

53.     On April 2, 2018, the Howard University Faculty Senate passed a historic vote of "no confidence" in Howard University's President, Provost, executive committee of the Board of Trustees, and Chief Operating Officer. The Faculty Senate made clear its rationale: the Provost had "failed to develop a system of evaluation of deans and directors, which he promised five years ago, resulting in a climate of fear of retaliation and intimidation on campus." Further, that statement represented "evidence compiled over many years," which was "tangible and verifiable, quantifiable and experiential." For the professors who had been retaliated against, including Dr. Mosleh, it was a "critical time for leadership transition." Their careers depended on it.

54.     On May 11, 2018, Department Chair Yilmaz evaluated and rated Dr. Mosleh's research in 2017-2018 academic year as 2: satisfactory. In the academic year, Dr. Mosleh was i) the Principal Investigator (PI) or co-PI for $775,819 sponsored projects and $500,000 pending sponsored project, ii) issued two United States patents at Howard University, iii) published 3 papers, and iii) advised one PhD and one Master's students.  Department Chair Yilmaz stated that since Dr. Mosleh's research is not 3: good or 4: outstanding his teaching load in 2018-2019 after coordination with Dean Messac will be increased.

55.     Dr. Mosleh informed the Administration on May 14, 2018 of the Chair's plan to increase his teaching load.  An interview by Mr. James Pierce of Office of Human resources was conducted.   However, the teaching load of Dr. Mosleh in 2018-2019 was increased to undergraduate core courses with no teaching of graduate courses or elective course in Dr. Mosleh's expertise.

56.     On April 2, 2018, the Administration announced that one of Dr. Mosleh's Ph.D. students, Mr. M.R., who had a GPA of 3.67, had passed his Candidacy Exam, with one stipulation: he would be required to take "Theory of Elasticity" and "Advanced Dynamics" at any of the Consortium Universities (GWU, UMD, Catholic, Howard).  Theory of Elasticity is not a required or an elective course in mechanical engineering at Howard University. The stipulation was not only unprecedented, it was impossible to achieve: None of the Consortium Universities offered "Theory of Elasticity" at all the following year. Dean Messac also Denied tuition or stipend support for Mr. M.R. in Fall 2017 and Fall 2018.  Howard University also denied funding to Mr. M.R. when he applied for Just-Julian Award in 2017.

57.     On August 26, 2018, Dr. Mosleh emailed the Administration to ask for its help one final time: "Could you please provide your response to my complaint of August 28, 2016?" As Dr. Mosleh noted, "there was no response" to his 2016 retaliation complaint against Dean Messac. Nor did the Administration respond now. To date, Howard University has refused to address Dr. Mosleh's complaint.

58.     In fall of 2018, Dr. Mosleh's student Mr. M.R. enrolled in Ph.D. Dissertation, as he was unable to register for his "required" "Theory of Elasticity" course. He was immediately ordered to be removed: "only doctoral students who have been admitted into candidacy are allowed to register for this course." To keep his student visa, Dr. Mosleh's graduate student was forced to enroll in an unrelated course while incurring full tuition.

59.     By October 9, 2018, Howard University had done nothing to respond to Dr. Mosleh's retaliation complaint against Dean Messac and had made no effort to change the environment of retaliation and intimidation it had created.

60.     On November 8, 2018, Dr. Mosleh wrote to the Administration objecting to "this historically unprecedented stipulation" that was "impossible" for his student to achieve, given that "none of the consortium universities has offered Theory of Elasticity." As Dr. Mosleh noted, Howard University's arbitrary stipulation meant that his "student was subjected to a semester of stalled academic progress with full tuition and expenses, which are mostly unpaid and there has been no institutional support to help." Worse, Howard University's online system showed "a Ph.D. student of another advisor, who has not taken the Candidacy Exam, is enrolled in Ph.D. Dissertation in Fall 2018." Dr. Mosleh reached the obvious conclusion: "I believe my Ph.D. students have been adversely affected because of their association with me."

## COUNT I
## DISCRIMINATION ON THE BASIS OF RACE AND/OR NATIONAL ORIGIN IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT, D.C. CODE § 2-1401, *ET SEQ.*

61.     Dr. Mosleh hereby reincorporates all factual allegations as though set out in full.

62.     The D.C. Human Rights Act ("DCHRA") prohibits discrimination on the basis of race and/or national origin with respect to an employee's compensation, the terms, conditions, or privileges of his employment, including promotion, or to otherwise adversely affect the terms of his employment. D.C. Code § 2-1401.11.

63.     Howard University discriminated against Dr. Mosleh by paying him a lower annual base salary than other employees and denying him promotions for which he was entitled. Dr. Mosleh put Howard University on notice that he reasonably believed he was the victim of discrimination based on race and/or national origin and that he objected to that discriminatory treatment by filing multiple formal complaints, and Howard University failed to take action, thereby condoning the discriminatory treatment.

64.     Howard University's actions caused Dr. Mosleh to suffer economic loss, including but not limited to salary and employee benefits, a loss of future professional opportunities and future income, and have caused damage to his professional reputation, humiliation, indignity, personal embarrassment, and pain and suffering.

## COUNT II
## RETALIATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT, D.C. CODE § 2-1401, *ET SEQ.*

65.     Dr. Mosleh hereby reincorporates all factual allegations as though set out in full.

66.     The DCHRA makes it unlawful for an employer to discriminate against any of its employees because an employee has opposed any practice made unlawful by the DCHRA.

67.     Howard University aided, abetted, invited, and compelled the discriminatory conduct complained of herein in violation of the District of Columbia Human Rights Act.

68.     Dr. Mosleh engaged in protected activity by opposing treatment that he reasonably believed constituted unlawful discrimination, including objecting to his inferior pay by filing internal complaints with Howard University and filing a lawsuit in D.C. Superior Court. On or about June 23, 2016, Dr. Mosleh objected to his discriminatory pay to Dean Messac, who agreed that he was "grossly underpaid."

69.     Howard University took adverse action against Dr. Mosleh that was causally connected to his protected activity. Howard University allowed Dean Messac to demote Dr. Mosleh by revoking his deanship in direct response to his complaint of discriminatory pay. Other instances of retaliation include, *inter alia*, Dean Messac's retaliatory harassment when Dr. Mosleh filed a grievance against him with Howard University, his revocation of Dr. Mosleh's position as Campus Representative of the American Society of Engineering Education, his refusal to award Dr. Mosleh a College of Engineering stipend to which he was entitled as a faculty member who

had timely applied, his continued insistence that Dr. Mosleh falsely certify his work for Howard University as Boeing research, his removal of Dr. Mosleh for consideration for a promotion as Chair of the Department of Mechanical Engineering, his disciplinary removal of Dr. Mosleh from teaching graduate courses, his disciplinary removal of Dr. Mosleh from graduate education activities,  and his removal of Dr. Mosleh as a written examiner for doctoral candidacy exam in spring of 2018.

70.     Howard University's conduct was intentional, deliberate, willful, and continued in reckless disregard for Dr. Mosleh's legally protected rights. Howard University has engaged in a documented pattern and practice of retaliating against faculty members and employees who complain about discrimination.

71.     Howard University's actions directly and proximately caused Dr. Mosleh to suffer economic loss, including but not limited to salary and employee benefits, a loss of future professional opportunities and future income, in addition to damage to his professional reputation, humiliation, indignity, personal embarrassment, and pain and suffering.

72.     Howard University took the actions complained of herein with actual intent to cause injury to Dr. Mosleh.

## COUNT III
## BREACH OF CONTRACT
### (Associate Dean)

73.     Dr. Mosleh hereby reincorporates all factual allegations as though set out in full.

74.     In May of 2016, Howard University and Dr. Mosleh entered into a one-year contract awarding Dr. Mosleh the position of Acting Associate Dean for Research and Graduate Education.  Pursuant to that contract, Dr. Mosleh was guaranteed an annual stipend of $15,000 and was required to oversee the research of graduate students.

75.     In July of 2016, Howard University breached that contract by forcing Dr. Mosleh to undertake tasks outside the scope of his contractual duties and refusing to pay Dr. Mosleh the stipend to which he was entitled.

76.     Dr. Mosleh has suffered harm as a result of Howard University's material breach of the contract.

## COUNT IV
## BREACH OF CONTRACT
### (Summer Employment)

77.     Dr. Mosleh hereby reincorporates all factual allegations as though set out in full.

78.     In July of 2016, Howard University offered Dr. Mosleh a second contract for wages in the amount of $31,815 to compensate Dr. Mosleh for the clerical tasks he performed for Howard University from May through August of 2016, which Dr. Mosleh accepted.

79.     In August of 2016, Howard University breached Dr. Mosleh's summer employment contract by refusing to pay his summer salary.

80.     Dr. Mosleh has suffered harm as a result of Howard University's material breach of the contract.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Mosleh demands a trial by jury and prays this Court for the following relief:

1.     Enter a judgment in Dr. Mosleh's favor and against Defendant Howard University for discrimination on the basis of race and/or national origin and retaliation in violation of the D.C. Human Rights Act § 2-1401, *et seq*;

2.     Enter a judgment in Dr. Mosleh's favor and against Defendant Howard University for common law retaliation;

3. Enter a judgment in Dr. Mosleh's favor and against Defendant Howard University for breach of contract;

4. Award Dr. Mosleh compensatory damages for the pain and suffering, damage to career, and loss of enjoyment of life, that he has experienced as a result of Defendant's unlawful conduct in an amount to be determined at trial;

5. Award Dr. Mosleh punitive damages in an amount to be determined at trial;

6. Award Dr. Mosleh back pay, front pay, and other amounts necessary to make him whole for the unlawful actions taken against him;

7. Award Dr. Mosleh's reasonable attorneys' fees and costs;

8. Award Dr. Mosleh all other relief permitted under the above causes of action or which this Court deems just and proper.

February 11, 2019     Respectfully submitted,

        **SCHULMAN BHATTACHARYA, LLC**

    By:   /s/ Koushik Bhattacharya
      Jeremy W. Schulman (D.C. Bar No. 481755)
      Koushik Bhattacharya (D.C. Bar No. 1006901)
      7500 Old Georgetown Road, Suite 901
      Bethesda, Maryland 20817
      Tel: (240) 356-8550
      Facsimile: (240) 356-8558
      E-mail:jschulman@schulmanbh.com
      kbhattacharya@schulmanbh.com

      *Counsel for Plaintiff Mohsen Mosleh*

## **JURY DEMAND**

Plaintiff requests trial by jury as to all issues in this case.

/s/ Koushik Bhattacharya
Koushik Bhattacharya
