# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MOHSEN MOSLEH,

*Plaintiff,*

v.

Civil Action No. 1:19-cv-00339 (CJN)

HOWARD UNIVERSITY,

*Defendant.*

## MEMORANDUM OPINION

Plaintiff Dr. Mohsen Mosleh is an Iranian-American professor at Howard University. He alleges that Howard has discriminated against him on the basis of race or national origin and has retaliated against him for raising his discrimination claims, all in violation of the D.C. Human Rights Act (DCHRA), D.C. Code § 2-1402.11, *et seq. See generally* Compl., ECF No. 1. He also asserts two breach-of-contract claims. *Id.* Howard moves to dismiss for failure to state a claim. Def.'s Mot. to Dismiss Pl.'s Compl., ECF No. 8. For the reasons stated below, the Motion is granted in part and denied in part.

## I.      Statement of Facts

Mosleh was hired by Howard in 1996 and has been a tenured professor of mechanical engineering since 2009. Compl. ¶¶ 8, 10.[1] At some point in 2009, Mosleh discovered that his base salary was $80,099, while the minimum base salary for other mechanical engineering professors was $96,673. *Id.* ¶ 11. Believing he was being paid less because he is Iranian,

---

[1] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must, of course, accept well-pleaded facts in the Amended Complaint as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Mosleh raised his concerns with the University beginning in 2010, including by writing a letter to the administration that sought to negotiate a higher salary. *See id.* Those efforts were unsuccessful, and from 2009 to 2013, Howard paid Mosleh between $14,000 and $17,000 less annually than every other tenured professor in the College of Engineering, and from 2014 to 2017, Howard paid Mosleh $13,000 to $15,000 less annually than his colleagues. *Id.* The disparate pay in turn affected the amount Mosleh could charge to his grant accounts and reduced Howard's contributions to his retirement. *Id.* Mosleh wrote two more letters addressing the pay discrimination to the administration and the dean of the College in 2012 and 2013, respectively. *Id.* ¶ 12.

On May 2, 2016, Mosleh was named the acting associate dean for research and graduate education in the College of Engineering. *Id.* ¶¶ 4, 13. This position guaranteed an annual stipend of $15,000 in addition to Mosleh's base salary, but Howard did not take steps to address the ongoing issue of his lower salary. *Id.* ¶ 13. Although the new position was not effective until July 1, Mosleh was required to complete ten to twelve hours of clerical tasks daily for Achille Messac, the dean of the College, beginning in May 2016. *Id.* ¶ 14. Those duties were originally uncompensated, but Mosleh and Messac ultimately agreed that Howard would pay Mosleh a summer salary of $489.46 per diem (based on his nine-month salary of $95,446) if he continued to perform the clerical work through the third week in June. *See id.* ¶ 15.

In June, Mosleh learned that he had been awarded a new research contract through The Boeing Company and forwarded this news to Messac. *Id.* ¶ 16. Thereafter, Messac asked Mosleh to continue performing the clerical tasks through mid-August, and Mosleh agreed, so long as he continued to receive the agreed upon per diem payment, which he reiterated could not come from the Boeing account. *Id.* ¶ 18. Mosleh also continued to complain that he was being

discriminated against, citing his salary and Howard's initial reluctance to compensate him for the clerical tasks. *Id.* The next month, Messac promised Mosleh a payment of $31,815 for his work from May 14, 2016, to August 14, 2016. *Id.* ¶ 20.

Mosleh had repeatedly protested his being paid for clerical tasks from the Boeing grant. *See id.* ¶¶16–17. But in August 2016, Mosleh learned that the University was in fact billing Boeing for his summer salary. *Id.* ¶¶ 21–22. Following Mosleh's complaints about the situation, Messac removed Mosleh from his position as acting associate dean—an act Mosleh claims was in retaliation "for reporting that he was the victim of discrimination and/or for refusing to breach ethical and legal standards." *Id.* ¶ 25. Approximately two weeks later, Mosleh filed a formal grievance against Messac and threatened legal action for his demotion and for the improper authorization of payment from the Boeing contract. *Id.* ¶¶ 26–27. Mosleh reiterated the claimed salary discrepancies and requested a formal salary review in October, to no avail. *See id.* ¶¶ 28–31.

Not only did Howard fail to address Mosleh's complaints, but it allegedly "endorse[d] a continuing campaign of retaliation." *Id.* ¶¶ 31–33. Messac assigned Plaintiff a substantial teaching load that, Mosleh alleges, kept him from fulfilling his obligations to Boeing and required him to teach undergraduate classes he had never taught during his time at Howard. *See id.* ¶¶ 33–34. Mosleh also learned that he had been removed from his position as campus representative for the American Society of Engineering Education ("ASEE")—despite the fact that he had been executing various tasks for the ASEE for months without being notified of the removal. *Id.* ¶¶ 34–35.

The alleged retaliation continued into 2017: Mosleh did not receive a $15,000–$20,000 stipend to which he claims he was entitled, and he was eliminated from consideration for the

position of chair of the Department of Mechanical Engineering. *Id.* ¶¶ 36, 38.

On March 1, 2017, Mosleh filed an official grievance asserting Messac had violated Howard's rules and procedures governing the chair selection process, *id.* ¶¶ 38–39, and on April 5, 2017, Mosleh sued Howard in D.C. Superior Court, asserting discrimination and unlawful discharge, *see id.* ¶ 42. The next month, Mosleh successfully graduated a Ph.D. candidate but did not receive the corresponding stipend that was awarded to faculty members who had similarly graduated Ph.D. recipients. *Id.* ¶¶ 43–44.

Due to an onset of medical issues beginning in May 2017, Mosleh requested sabbatical leave for the following year. *See id.* ¶¶ 45–46, 52. This request was denied even though he had not requested sabbatical once in his twenty years at Howard. *Id.* ¶ 47. And Mosleh's students were also caught up in his conflict with the administration—they were denied tuition and stipend support and the administration imposed unprecedented course requirements on one them. *See id.* ¶¶ 48–49, 56, 58, 60.

In May 2018, Department Chair Yilmaz evaluated Mosleh's research for the 2017–2018 academic year and rated it as only "satisfactory," triggering an increase in Mosleh's teaching load. *Id.* ¶ 54. But Mosleh's teaching load not only increased, he was also required to teach undergraduate core courses only, not graduate or elective courses related to his areas of expertise. *Id.* ¶ 55.

Meanwhile, from April 5, 2017, to November 15, 2018, Mosleh litigated his suit in D.C. Superior Court. Following an amendment in September 2017, Mosleh's complaint asserted discrimination and retaliation claims under the DCHRA, as well as a breach of contract claim based on Howard's payment of the summer wages from the Boeing contract. *See generally* Mot., Ex. 7, ECF No. 8-8. The D.C. Superior Court granted Howard's motion to dismiss in part,

permitting Mosleh's discrimination and retaliation claims to survive but dismissing his breach of contract claim in an order that did not specify whether that dismissal was with or without prejudice. *See generally* Mot., Ex. 8, ECF No. 8-9. After retaining new counsel, Mosleh voluntarily dismissed his D.C. Superior Court action without prejudice, *see* Compl.¶ 42; Mot. at 12, and filed this action on February 11, 2019.

## II.      Legal Standard

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), Mosleh must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "[T]he Court must construe the complaint in the light most favorable to the plaintiff and accept as true all reasonable factual inferences drawn from well-[pleaded] factual allegations." *Nicholson v. Spencer*, 311 F. Supp. 3d 1, 3 (D.D.C. 2018) (citing *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)). The Court is also permitted to consider exhibits appended to the Motion (without converting the Motion to Dismiss into a motion for summary judgment) if they are "referred to in the complaint and integral to a claim." *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 101 (D.D.C. 2015) (citing *U.S. ex rel. Folliard v. CDW Tech. Servs.*, Inc., 722 F. Supp. 2d 20, 24–25 (D.D.C. 2010)).

## III.      Analysis

**A.      Count I:  Discrimination on the Basis of Race or National Origin in Violation of the D.C. Human Rights Act**

Mosleh asserts that Howard discriminated against him by paying him a lower annual base

salary than other professors in the College of Engineering.[2]  Howard does not dispute that Mosleh has adequately pleaded the elements of his discrimination claim.  Instead, Howard argues that the DCHRA's one-year statute of limitations bars this claim in its entirety, or alternatively, that Mosleh cannot base his discrimination claim on events occurring more than one year before he filed his initial complaint in D.C. Superior Court.  *See* Def's Mem. in Supp of Mot. to Dismiss Pl.'s Am. Compl. ("Mot."), ECF No. 8-1, at 13; Def.'s Reply Mem. to Pl.'s Opp'n to Mot. ("Reply"), ECF No. 10, at 1–4.

The DCHRA provides that a discrimination claim is timely if it is filed "*within one year of the unlawful discriminatory act*, or the discovery thereof . . . ."  D.C. Code § 2-1403.16(a) (emphasis added).  To determine whether discrimination claims are time-barred, the Court, in "construing the facts in the light most favorable to plaintiff," must look to "the latest possible date on which a discriminatory act could have occurred or plaintiff could have become aware of the alleged discrimination."  *Coates v. Edgewood Mgmt. Corp.*, 258 F. Supp. 3d 107, 114 (D.D.C. 2017).  More importantly, the D.C. Court of Appeals has held that in a disparate-pay case, each allegedly smaller paycheck is its own actionable event under the DCHRA, triggering the running of its own statute of limitations.  *Zuurbier v. Medstar Health, Inc.*, 895 A.2d 905, 910–14 (D.C. 2006).  That court has also held that the continuing violation doctrine—which permits claims that are otherwise barred by the statute of limitations to be actionable when they are pervasive acts continuing into the statute of limitations—does *not* apply in cases of allegedly discriminatory paychecks.  *See id.*  Those holdings are, of course, binding here.  *See Easaw v.*

---

[2] Mosleh initially asserted discriminatory conduct based on both disparate pay and the denial of promotions for which he was entitled, *see* Compl. ¶ 63, but he conceded at oral argument that the denial of the promotion "might be more properly considered" as part of the retaliation count, Nov. 13, 2019 Mot. Hr'g Tr. at 31–32, ECF No. 11.

*Newport,* 253 F. Supp. 3d 22, 34 (D.D.C. 2017) ("To properly discern the content of state law, courts must defer to the most recent decisions of the state's highest court, and when interpreting and applying D.C. law, courts fulfill this obligation by looking to the published opinions of the D.C. Court of Appeals." (internal quotation marks and citations omitted)).

Howard is therefore correct that Mosleh cannot obtain relief by reaching back to 2009, when he first discovered the pay discrimination. (Indeed, Mosleh does not appear to dispute that the statute limits his claim to discriminatory acts occurred in the period beginning one year before the commencement of his D.C. Superior Court action.) But Howard is wrong that Mosleh's entire pay-discrimination claim is barred.[3] Instead, Mosleh is precluded only from pursuing claims based on paychecks he received more than one year before initiating suit.[4]

Howard contends that the cutoff should be April 5, 2016, one year before Mosleh filed his original complaint in D.C. Superior Court. That may not be correct. After all, "once a suit is dismissed," as was the case here when Mosleh voluntarily dismissed his D.C. Superior Court complaint on November 15, 2018, Compl. ¶ 42, "the tolling effect of the filing of the suit is wiped out and the statute of limitations is deemed to have continued running from whenever the cause of action accrued, without interruption by that filing." *Ciralsky v. CIA,* 355 F.3d 661, 672

---

[3] None of the authorities on which Howard relies supports the proposition that because Mosleh has long been aware of discrimination, he should not be permitted to raise claims based on discriminatory acts that occurred within the one-year statute of limitations. In both *Paul v. Howard University*, 754 A.2d 297 (D.C. 2000), and *Coates*, 258 F. Supp. 3d 107, the plaintiffs did not allege any actionable discriminatory acts within the year preceding their lawsuits.

[4] While Howard argued in its opening brief that Mosleh's discrimination claim is barred by the one-year statute of limitations, it first argued that the statute of limitations would bar the discrimination claim *in its entirety* in its Reply and therefore may have waived this argument. *See Lindsey v. District of Columbia*, 879 F. Supp. 2d 87, 95–96 (D.D.C. 2012) (citing *In re Asemani*, 455 F.3d 296, 300 (D.C. Cir. 2006)). The Court need not decide the waiver question, however, because it concludes the argument is incorrect.

(D.C. Cir. 2004) (citation omitted). The DCHRA statute of limitations may thus have precluded claims based on events that occurred more than one year before February 11, 2019, the date on which the Complaint *here* was filed.

But "[a] statute of limitations defense is an affirmative defense," *Stafford v. George Washington Univ.*, No. 18-cv-2789, 2019 WL 2373332, at *8 (D.D.C. June 5, 2019), and Howard has never argued that the tolling effect of the D.C. Superior Court litigation was wiped out when Mosleh voluntarily dismissed it. The Court will therefore apply the one-year statute of limitations as Howard has argued it. *See id.* (applying three-year statute of limitations in Title VI action instead of applicable one-year statute of limitations where defendant erroneously—and to its detriment—asked court to apply three-year limit).

Accordingly, Howard's Motion to Dismiss Count I is denied, but this claim is limited to alleged acts of discrimination occurring since April 5, 2016.

## B. Count II: Retaliation in Violation of the D.C. Human Rights Act

In Count II of his Complaint, Mosleh asserts that he engaged in protected activities by opposing discrimination on various occasions, including discussing disparate pay on a conference call, filing internal grievances related to his base salary, and bringing suit against Howard for discrimination. *E.g.*, Compl. ¶ 68. He alleges that Howard retaliated against him for those activities when it allowed Messac to revoke both Mosleh's assistant deanship and position as an ASEE campus representative and refused to award him a stipend for which he was eligible, among other actions. *Id.* ¶ 69.

To state a case of retaliation under the DCHRA, Mosleh must demonstrate that: "(1) [he] engaged in a protected activity by opposing or complaining about employment practices that are unlawful under DCHRA; (2) [his] employer took an adverse personal action [him]; and (3) there

existed a causal connection between the protected activity and the adverse personnel action."

*Vogel v. D.C. Office of Planning*, 944 A.2d 456, 463 (D.C. 2008) (citation omitted);[5] *see also*

*Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994). In assessing whether Mosleh has met his

burden, this Court may look to analogous Title VII employment discrimination and retaliation

cases. *See Green*, 652 A.2d at 45.

### 1. Protected Activities

Howard argues that Mosleh did not engage in any plausible protected activities before he

filed his first complaint in D.C. Superior Court. *See* Mot. at 14. Focusing primarily on three

communications identified in the Complaint, Howard argues that one, the June 23 conference

call, is implausible because Mosleh omitted it from his previously filed complaints. *See* Reply at

4. Howard offers no authority, however, for the proposition that the Court should not credit this

allegation simply because it was not in Mosleh's earlier complaints, particularly when litigants

are routinely permitted to amend their pleadings to address any potential deficiencies. This

applies even more so here, where Mosleh retained new counsel to litigate in this Court. *See* Nov.

13, 2019 Mot. Hr'g Tr. at 42–43, ECF No. 11.

Howard also argues that the June 23 call did not "invoke any discriminatory conduct,"

---

[5] In its Reply, Howard cites to *Burlington N. & Santa Fe Ry. Co. v. White*, a Title VII case in which the Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action *materially* adverse, which . . . means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination," 548 U.S. 53, 68 (2006) (emphasis added) (internal quotation marks and citations omitted). Reply at 5. Howard notes that the Superior Court order did not apply the *materially* adverse employment action standard in denying dismissal of the retaliation claim. Reply at 5 n.5. Based on the Parties' briefing, it is unclear whether *Burlington*'s requirement that an alleged retaliatory action must be *materially* adverse imposes a heightened pleading burden that would apply in the DCHRA context. Given that the "material adversity" requirement exists to distinguish from "trivial harms," *Burlington*, 548 U.S. at 68, it is unnecessary to probe into whether the Title VII and DCHRA standards differ because Mosleh has met the material adversity requirement by adequately pleading non-trivial harms.

Mot. at 14, and that the allegation itself is "cursory" because Mosleh did not "plead any specific details." Reply at 5. But as Mosleh rightly points out, to claim a protected activity, he need only plead that he "opposed conduct that [he] reasonably believed to violate" the DCHRA and show that he "voice[d the] complaint about . . . the allegedly unlawful activity." *Carter-Obayuwana v. Howard Univ*, 764 A.2d 779, 791 (D.C. 2001) (rejecting trial court's assumptions that plaintiff was not engaged in protected activity under Title VII until she filed a complaint with D.C. Office of Human Rights) (second alteration and omission in original)). Mosleh alleges that he did precisely that: he informed Messac, on a conference call with at least one other person, that he still believed he was a victim of discriminatory pay and that this conversation resonated with Messac—so much so, that Messac memorialized the conversation in an email two days later by remarking that Mosleh was "grossly underpaid; [sic] surely as an associate dean!" Compl. ¶¶ 18–19. Mosleh did not need to invoke "magic words" like "discrimination" in his conversation with Messac, especially because "'the communication of a complaint of unlawful discrimination . . . may be *inferred* or *implied*' from the surrounding facts," which, in this case, include his repeated complaints about pay discrimination dating back to 2009. *Carter-Obayuwana*, 764 A.2d at 791 (omission in original) (quoting *Green*, 652 A.2d at 47).

As to the other two communications, Howard argues that they merely chronicled Mosleh's dissatisfaction with Messac and the ethical concerns surrounding the certification of Boeing funds but did not invoke any discriminatory conduct. *See* Mot. at 14–16. But even assuming that Howard's interpretation of those two communications is correct, the Complaint alleges at least two *other* protected activities: an October 4, 2016 email reiterating that Mosleh was a victim of pay discrimination and requesting a formal review of his salary, Compl. ¶ 28, and an October 13, 2016 email to Messac asserting that other comparable professors received

higher salaries, *id.* ¶ 29.  Howard neglects to address these additional communications altogether, and along with Mosleh's other allegations, they constitute activities protected by the DCHRA.

### 2.    Adverse Actions

Howard also argues that the allegedly adverse actions taken against Mosleh, *e.g.*, *id.* ¶¶ 36, 69, are unactionable "[m]ere inconvenience[s]" because they do not "affect[] [Mosleh's] financial status," Mot. at 15 (citing *Childers v. Slater*, 44 F. Sup. 2d 8, 19 (D.D.C. 1999); *Russell v. Principi*, 257 F.3d 815 (D.C. Cir. 2001)).  But Mosleh alleges a denial of multiple stipends, Compl. ¶¶ 36, 44,[6] which would surely impact his financial status and meet even Howard's standard.  But Howard also misstates the relevant inquiry.  The Supreme Court has clarified that the antiretaliatory provision in the analogous Title VII context is not necessarily confined to discriminatory actions that affect the terms and conditions of employment. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006).  Rather, an employer's adverse action can be actionable if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Propp v. Counterpart Intern.*, 39 A.3d 856, 863–64 (D.C. 2012) (citing *Burlington*, 548 U.S. at 68).  "Context" and the "particular circumstances" are crucial in assessing the reactions of a reasonable employee, and "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations,

---

[6] Howard argues that the allegation that Mosleh was denied a stipend for graduating a Ph.D. student is "demonstrably false and previously adjudicated by the Superior Court," which held that Howard "was under no obligation to award Plaintiff a stipend."  Reply at 6 n.9.  But whether this allegation is "demonstrably false" is a question ill-suited for the motion to dismiss stage, and the Court declines to consider emails related to the stipend that were not referred to in the Complaint.  Even assuming the issue was adjudicated by the Superior Court, Howard does not expressly argue that Mosleh is estopped from relitigating this particular issue.  And importantly, the Superior Court does not appear to have discussed the $5,000 stipend at issue; it did, however, hold that Mosleh adequately pleaded that Howard took adverse personnel actions against him, including by withholding a $15,000–$20,000 stipend.  Mot., Ex. 8 at 7.

and relationships." *Burlington*, 548 U.S. at 69 (holding that reassignment and suspension without pay constituted retaliation and citing authority that schedule changes and exclusion from weekly training lunches may also be retaliatory).

Here, Mosleh has pleaded that Howard retaliated against him by increasing his teaching load and by reassigning him undergraduate, instead of graduate, courses outside his area of expertise. Compl. ¶¶ 33, 55. "[R]eassignment with significantly different responsibilities . . . generally indicates an adverse action." *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (omission in original) (citation omitted); *see also Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) (listing "undesirable reassignment" as example of actionable "tangible employment action" (citations omitted)). And Mosleh was removed from consideration for chair of the Department of Mechanical Engineering, *id.* ¶ 38, which plainly affected his *future* employment opportunities. *See Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) ("[A]n employee suffers an adverse employment action if he experiences materially adverse consequences affecting. . . future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."). In sum, Mosleh has pleaded adverse actions that affected his financial status, responsibilities, and future employment opportunities, each of which could dissuade a reasonable employee from making charges of discrimination, and which together satisfy this element of his retaliation claim.

### 3. Causation

Howard further argues that Mosleh has not alleged that Howard's desire to retaliate against his protected activities was the but-for cause of the adverse actions, as opposed to a mere motivating factor. *See* Tr. at 20–21. It paints Mosleh's complaints about the Boeing contract billing issues—which are not protected activities under the DCHRA—as the true reasons for its actions.

Howard first raised this version of its causation argument during the hearing on its Motion to Dismiss; it never argued in its briefs that Mosleh must satisfy the but-for standard. It is also far from clear that this standard applies to DCHRA retaliation claims. *Compare Watson v. D.C. Water & Sewer Authority*, No. 16-cv-2033, 2018 WL 6000201, at *16 (D.D.C. Nov. 15, 2018) ("[U]nder . . . the DCHRA, the plaintiff need only prove that retaliation was a 'motivating factor.'"), *aff'd*, 777 F. App'x 529 (D.C. Cir. 2019), *and Jones v. D.C. Water & Sewer Auth.*, No. 12-cv-1454, 2016 WL 659666, at *7 (D.D.C. Feb. 18, 2016) ("[N]either the D.C. Court of Appeals nor the D.C. Circuit has weighed in on whether [Title VII cases] in any way altered the causation standard under the DCHRA's retaliation provision. To date, D.C. courts have not required 'but-for' causation, but instead have used a standard comparable to the 'motivating factor' test." (citations omitted)), *with Nunnally v. District of Columbia.*, 243 F. Supp. 3d 55, 67 (D.D.C. 2017) (applying "but-for" test), *and Martin v. District of Columbia*, 78 F. Supp. 3d 279, 313 (D.D.C. 2015) (same).

But under either test, Mosleh has adequately alleged a causal connection between his protected activities and Howard's adverse actions. At the motion to dismiss stage, the initial burden of showing causation is "not great;" Mosleh needs only to allege "facts adequate to permit an inference of retaliatory motive." *Robinson v. Ergo Sols., LLC*, 85 F. Supp. 3d 275, 282 (D.D.C. 2015) (citing *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C. Cir. 1985)). Here, Mosleh alleges that Howard both knew of his protected activities and that Howard took adverse action against him soon after those activities. *See id.* (citing *Mitchell*, 759 F.2d at 86)).

Howard points out that more than three months elapsed between the time Mosleh lodged his first complaint and the adverse employment actions, thereby preventing any inference of causation. Mot. at 17. But as discussed above, Howard ignores Mosleh's other allegations of

protected activity and thus fails to account for the alleged retaliatory conduct that did in fact occur within three months of a protected activity. For example, in October 2016, Mosleh complained about his allegedly discriminatory pay, Compl. ¶¶ 28–29, and within two months Mosleh learned that he had been removed from his position as ASEE campus representative and that his "highly demanding" and "punitive" spring teaching assignments had been confirmed. *Id.* ¶¶ 34–35. To be sure, it is not entirely clear when the new teaching schedule was initially set, and Messac claimed that Mosleh's removal was effective months before he had learned of it. But taking the facts in the light most favorable to Mosleh, he appears to have pleaded that there were adverse employment decisions two months after he complained about his disparate pay, and "applying a rigid cut-off would only encourage malfeasant employers to wait until the time limit has just passed before taking retaliatory action." *Robinson*, 85 F. Supp. 3d at 282.

Howard also ignores case law holding that retaliatory conduct that occurred during the course of litigation, "long after the *original* protected activity," may sufficiently indicate a temporal causation link. *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) (emphasis added) (internal quotation marks omitted) (noting that plaintiff's Title VII appeal to D.C. Court of Appeals six years after original protected activity was itself a protected activity). In addition to the pre-litigation conduct discussed above, Mosleh also alleges that he continued to experience retaliatory conduct while he litigated his suit in D.C. Superior Court—including the denial of his sabbatical request on September 19, which was fourteen days after he amended his complaint. Compl. ¶ 47; Mot. Ex. 7. Mosleh has therefore shown a sufficient causal connection by "repeatedly engag[ing] in protected activity during the . . . period" in which he was subject to adverse actions. *Holcomb*, 433 F.3d at 903; *see also Singletary*, 351 F.3d at 524–25.

Mosleh undoubtedly faces a significant hurdle of proving that these allegedly adverse actions stemmed from his discrimination grievances and not his opposition to the Boeing billing charges. But at this stage, the Court cannot "conclude categorically . . . that causation cannot be established." *Robinson*, 85 F. Supp. 3d at 282.

## C.      Count III:  Breach of Contract (Associate Dean)

Mosleh alleges two breach of contract claims. The first pertains to his position as the acting associate dean. The allegations and arguments in support of this claim are difficult to untangle, especially in light of Mosleh's prior representations in D.C. Superior Court. He appears to argue that Howard breached the contract in two ways:  by requiring him to perform certain tasks outside the scope of his contractual duties and by failing to pay him the $15,000 "guaranteed . . . annual stipend." Compl. ¶¶ 4, 73–76; Pl.'s Opp'n to Mot. ("Opp'n") at 14–15. But these additional tasks appear to form the basis of a separate agreement, and as to the stipend, Mosleh has not plausibly alleged that he was entitled to a full year's stipend when he served as the acting associate dean for less than two months.

To plead a breach of contract, Mosleh must establish "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). The letter appointing Mosleh as acting associate dean,[7] which appears to be the contract at issue, states generally that Mosleh would serve in that role, assisting Dean Messac with his responsibilities, from July 1, 2016, to June 30, 2017. Mot., Ex. 1, ECF No. 8-2. The letter states

---

[7] Mosleh argues, rather quizzically, that the Court cannot consider the Appointment Letter because he never referenced it in his Complaint. Opp'n at 14. But as the Appointment Letter appears to set out the very terms Howard allegedly breached and is therefore integral to the Complaint, *see supra* at 5, Mosleh cannot prevent the Court from considering the contract simply because he never explicitly invoked the words "Appointment Letter."

that "[t]he 12-month administrative stipend for [the] appointment is $15,000" but also specifies that if another dean were appointed before the contract ended, the "contract and *any associated compensation will be terminated* on the new Associate Dean's appointment date." *Id.* (emphasis added).

Mosleh claims that Howard breached this agreement by forcing him to undertake certain clerical tasks for ten to twelve hours a day, beginning in *May* 2016. *See* Compl. ¶ 4; Opp'n at 14–15. But it is unclear how these additional duties "*aris[e] out of the contract*," which did not even go into effect until July. *Tsintolas*, 984 A.2d at 187 (emphasis added). The Complaint does not explain whether these clerical tasks had any relationship to or were entirely distinct from the tasks associated with his position as acting associate dean. What is more, Mosleh has pleaded that when he expressed his displeasure with the fact that he was uncompensated for these clerical tasks, Messac guaranteed him a summer salary of $489.46 per diem through June, and that when Messac and Mosleh extended this agreement to August, Howard agreed to pay Mosleh a summer salary of $31,815 (corresponding to a $489.46 per diem). *See* Compl ¶¶ 15, 18, 20. But this alleged agreement is distinct from the appointment letter, and indeed, Mosleh pleads its breach in Count Four.

Mosleh also alleges that Howard breached this contract (i.e., the appointment letter) by not paying him the full $15,000 stipend. But Mosleh has not plausibly alleged that he was entitled to *a full* year's stipend when he served as an acting associate dean for only one month and a half (from July 1, 2016, to August 16, 2016). *Id.* ¶¶ 13, 25. The terms of the appointment letter state that it was a "12-month administrative stipend" and that if Mosleh's position were terminated early, any associated compensation would likewise be terminated. Mot., Ex. 1. Moreover, in D.C. Superior Court, Mosleh asserted that he was "provided . . . a monthly stipend

of $1250" as part of his promotion, which is a prorated portion of the annual stipend. *See* Mot., Ex. 6 ¶ 19, ECF No. 8-7; Ex. 7 ¶ 32. In sum, Mosleh has not plausibly alleged that Howard had an obligation to pay Mosleh the entire stipend even if he did not work a full year, and because Howard paid him the prorated amount to which he was entitled, he cannot show related damages.

For these reasons, Count III fails to state a claim for breach of contract and is therefore dismissed.

### D.      Count IV:  Breach of Contract (Summer Employment)

Mosleh's second breach-of-contract claim alleges that Howard failed to pay him $31,815 for the clerical tasks he performed between May and August 2016. *See* Compl. ¶¶ 77–80. Howard argues that because the D.C. Superior Court dismissed this claim, it is precluded by res judicata. Mot. at 6, 19–20.

To determine the res judicata effect of the D.C. Superior Court decision, the Court looks to District of Columbia law. *See Camp v. Kollen*, 567 F. Supp. 2d 170, 172 n.4 (D.D.C. July 25, 2008) ("[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." (quoting *Migra v. Warren City Sch. Distr. Bd. of Educ.*, 465 U.S. 75, 81 (1984))). Because there are "'no material differences in the District of Columbia's law of res judicata and the federal common law of res judicata,' th[is] Court [may] rel[y] on both D.C. and federal precedent to inform its analysis." *Id.* (quoting *Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 78 n.4 (D.C. 2007)). In *Porter v. Shah*, the D.C. Circuit stated that:

> a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction.

606 F.3d 809, 813 (D.C. Cir. 2010) (citations and internal quotation marks omitted).

The Parties' arguments here are largely unhelpful. Howard assumes that the D.C. Superior Court order qualifies as a final judgment on the merits by repeatedly treating a "decision on the merits" as synonymous with "judgment on the merits." Mot. at 19; Reply at 9–10. Mosleh, for his part, relies upon the Parties' stipulated dismissal of the prior suit without prejudice but does not really address whether the Superior Court's initial dismissal of the breach of contract claim could have preclusive effect. Opp'n at 16.

A judgment refers to "any order from which an appeal lies." D.C. Super. Ct. R. Civ. P. 54(a). "[A]ny order or other decision . . . that adjudicates fewer than all the claims . . . does not end the action as to any of the claims and may be revised at any time before the entry of a judgment adjudicating all the claims . . . ." *Id.* at 54(b). Because the D.C. Superior Court order dismissing Mosleh's breach of contract claim did not adjudicate all of his claims or end the action, it almost certainly does not constitute a final judgment having preclusive effect.

In any event, while the Superior Court's decision likely does not have *preclusive* effect, the Court agrees with its reasoning and dismisses Count IV for the same reasons.[8] As discussed above, to adequately plead a breach of contract, Mosleh must establish "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas*, 984 A.2d at 187. But Mosleh himself alleges that he "was paid his $31,815 summer salary," albeit from the Boeing funds. Compl. ¶ 32. While Mosleh suggests that Howard was obligated to pay him from a source other than the Boeing grant, he points to no source for that alleged duty, and even if he could, "[m]ere breach without proof of monetary loss is . . . a wrong which results in no loss or damage, and thus

---

[8] *See* Mot. at 19 (arguing for dismissal by incorporating reasoning of D.C. Superior Court order and specifying that Mosleh failed to meet elements of establishing a contract was in existence to pay Mosleh from specific source and damages caused by breach).

cannot sustain an action.'" *Tsintolas*, 984 A.2d at 187 (internal citations and quotations omitted). The Court therefore dismisses this breach of contract count.

### IV.    Conclusion

For the foregoing reasons, Howard's Motion to Dismiss is **DENIED** as to Counts I and II and **GRANTED** as to Counts III and IV.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  February 27, 2020

CARL J. NICHOLS
United States District Judge