### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

MOHSEN MOSLEH,

*Plaintiff*,

v.

HOWARD UNIVERSITY,

*Defendant*.

Civil Action No. 1:19-cv-0339 (CJN)

### MEMORANDUM OPINION

Mohsen Mosleh is an Iranian American professor in Howard University's Department of Mechanical Engineering. *See generally* Compl., ECF No. 1. He alleges that Howard unlawfully discriminated against him on the basis of race and national origin and unlawfully retaliated against him, all in violation of the District's Human Rights Act, D.C. Code § 2-1402.11. *See generally* Compl. The Court dismissed Mosleh's breach-of-contract claims at the motion to dismiss stage but permitted his discrimination and retaliation claims to proceed. *See* Order, ECF No. 12; Memorandum Opinion ("Mem. Op."), ECF No. 11. Howard has now moved for summary judgment on those claims. *See generally* Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 33. For the reasons stated below, the Court grants Howard's motion.

### I.    Factual & Procedural Background

Mosleh was born in Iran and received his Ph.D. in mechanical engineering from the Massachusetts Institute of Technology in 1994. *See* Mohsen Mosleh's Deposition ("Mosleh's Deposition"), ECF No. 33-9 at 6; Compl. ¶ 3. He joined Howard as an assistant professor in 1996. *See* Mosleh's Deposition at 7. Howard promoted Mosleh to the rank of associate professor six

years later and to full professor in Howard's College of Engineering and Architecture (College for short) in 2009.  *Id.*

In September 2009, Mosleh and a couple colleagues sent a memorandum to Howard's then-interim Provost, expressing concerns about their compensation.  *See* Mosleh's Deposition at 8. The memorandum stated in part that Mosleh and his colleagues were "drastically underpaid" when compared with other comparable faculty members.  *See* Memorandum of September 29, 2009, ECF No. 33-10 at 2.  Mosleh sent additional communications to certain members of Howard's leadership over the next several years with requests for salary increases.  *See* Mosleh's Deposition at 8.  For instance, in August 2012, Mosleh sent a memorandum to the then-Provost indicating that he believed that his comparatively low salary level "can only be explained by *discriminatory treatment* by the [College's] leadership."  *See* Memorandum of September August 7, 2012, ECF No. 33-11 at 3 (emphasis in original); *see also* Mosleh's Deposition at 8.  He continued to make requests for salary increases thereafter.  *See* Letter of October 4, 2016, ECF No. 33-86 at 2–3.  He did not, however, allege salary discrimination on the basis of his race or national origin in these later communications.  *Id.*; *see also* Declaration of Anthony Wutoh ("Wutoh's Declaration"), ECF No. 33-81 at ¶ 19.  Instead, Mosleh contended that his relatively low pay did not align with his high performance and credentials.  *See* Letter of October 4, 2016, ECF No. 33-86 at 2–3.

Achille Messac joined the College as its new dean at the end of 2015.  *See* Achille Messac's Deposition ("Messac's Deposition"), ECF No. 33-23 at 6.  Shortly thereafter, Messac appointed Mosleh as acting associate dean, effective July 1, 2016.  *See* Mosleh's Deposition at 30.  Mosleh, however, started working for Messac well before that date.  *Id.* at 19.  Soon after, Mosleh learned that he had been awarded a new research grant through The Boeing Company and forwarded the news to Messac.  *See* Compl. ¶ 16.  Mosleh claims that, upon learning of the Boeing grant, Messac

2

stated that Mosleh's summer payment for completing clerical tasks as acting associate dean should come from the Boeing grant and not from College funds. *See* Mosleh Deposition at 31. Mosleh protested that it would be improper for him to be paid for that work from the grant rather than from College funds. *Id.* Mosleh claims that he was nevertheless paid from the Boeing funds. *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 36-2 at 17.

Mosleh relies heavily on events that occurred during the middle of 2016. On May 13, 2016, for example, in response to an email from Mosleh that twice omitted the article "the," Messac wrote that "all my PhD students from Iran had to learn from me to make sure they use their articles in speaking and writing. I see that I am going to have a new task with Dr. Mosleh. As Associate Dean, . . . a new task 😊 Don't forget articles." Email from May 13, 2016, ECF No. 33-12 at 2. The email did not mention or relate to Mosleh's compensation. Nor did it spur Mosleh to quit as acting associate dean.

During this period, Mosleh also proposed to Messac that the College establish a student chapter of the American Society for Engineering Education (ASEE), and Mosleh volunteered to serve as the ASEE campus representative. *See* Mosleh's Deposition at 37. Messac approved that request in late May 2016. *See* Achille Messac's Declaration ("Messac's Declaration"), ECF No. 33-42 at ¶ 28.

Days after Messac approved Mosleh's request, Mosleh voiced continued frustration to Messac with his summer compensation and his compensation as a professor more generally. *See* Mosleh's Deposition at 19. On June 23, 2016, Mosleh complained to Messac that his salary was "significantly lower" than some of his colleagues. *Id.* The next day, during a meeting in the presence of several colleagues that had nothing to do with compensation, Messac stated to Mosleh that "like all [of his] students from Iran, [Mosleh has] a problem in speaking and writing and using

articles." *Id.* at 15; Messac's Declaration at ¶ 33.  Discomforted, Mosleh emailed Messac voicing

his general displeasure with the poor grammar remark.  *See* Email Exchange of June 25, 2016,

ECF No. 33-12.  Mosleh wrote that "I very much welcome your input on all matters even on

personal levels because I admire and trust you . . . . [But it] concerned me when you raised the

'article' issue twice in front of others in our meetings.  I considered it demeaning." *Id.* at 2.  Mosleh

also expressed his displeasure with what he considered his low salary.  *Id.*  Messac responded by

saying that I "fully understand and I am troubled about the salary structure.  You are grossly

underpaid; surely as an associate dean!" *Id.*  He continued by remarking that "regarding the

'article' issue, I personally recall feeling completely fine with it when others corrected my English

along the way.  That was me; and I should not expect that others should feel the same way.  I am

sorry that it offended you, and will not do so in the future." *Id.*

Later that summer, several students complained to the College's leadership about a

particular senior professor and their lack of summer funding.  *See* Mosleh's Deposition at 32.

Messac tasked Mosleh to "come up with a plan" to address the situation.  *Id.*  Mosleh, however,

felt "uncomfortable" having to confront a senior professor and emailed Messac explaining his

trepidation.  *Id.*  Messac responded that meeting with the senior professor and the students "is part

of the reality of being an associate dean."  Student Complaint Email Exchange, ECF No. 33-14 at

3.  Mosleh replied with a string of complaints about the responsibilities of serving as acting

associate dean.  *Id.*  Mosleh wrote that the "stream of tasks for [him], including completely

unrelated ones to the research and graduate education, come[] via text, calls, and email from the

early morning to the late night.  And, often instant actions and replies are requested!" *Id.* at 2.

Mosleh also complained that his workload left him with "no time whatsoever during the week and

sometimes during the weekend to fulfill my obligations to my research contracts." *Id.*  Mosleh

concluded his email to Messac with the following statement regarding the use of funds from the Boeing grant to pay Mosleh's summer salary: "While the complete fixation on obtaining the result is understandable, there should be a consideration of the required logistic and the attention not to force others to break the ethical standards such as those required in conduct of sponsored research." *Id.* at 3. Messac responded less than an hour later that "the following comments are strongly inappropriate: . . . 'the attention not to force others to break the ethical standards such as those required for research." *Id.* at 2.

Days later, and soon after a meeting between Messac and Mosleh at which Mosleh again complained about his salary, Messac announced that Kimberly Jones would replace Mosleh as acting associate dean. *See* Email Announcing Acting Dean Change, ECF No. 33-49 at 2; Messac's Declaration at ¶ 39. Messac thanked Mosleh "for his many contributions as acting associate dean" in an email sent to numerous colleagues, and he announced that Mosleh would return to "the Department of Mechanical Engineering to focus on critical research that will advance the College." *See* Email Announcing Acting Dean Change, ECF No. 33-49 at 2.

At the end of August, Mosleh emailed the then-acting Provost to initiate a grievance against Messac for retaliation in removing him from the position of acting associate dean. *See* Mosleh's Grievance, ECF No. 36-10 at 3. A month later, after receiving notification that his pay would remain the same for the upcoming academic year, Mosleh again emailed the Provost to request a formal review of his salary. *See* Mosleh's Salary Grievance, ECF No. 36-11 at 2. In compliance with the College's policy, the Provost instructed Mosleh to contact his department's dean, who happened to be Messac. *See* Mosleh's Grievance, ECF No. 36-12 at 2. The grievance, according to Mosleh, went nowhere.

In the fall of 2016, the College initiated a search process to select a new Department Chair. *See* Messac's Declaration at ¶ 43.  A search committee developed a rubric to score the applicants and to narrow the candidates down to five.  *See* Gbadebo Owolabi's Deposition ("Owolabi's Deposition"), ECF No. 33-39 at 14.  Mosleh applied but did not advance past the initial screen. *See* Messac's Declaration at ¶ 44.  Months later, Mosleh filed a grievance with the Faculty Grievance Commission alleging multiple problems with the search process.  *See* Mosleh's Grievance, ECF No. 33-17.  The Commission agreed that the search committee violated provisions of Howard's Faculty Handbook, but it decided against taking any corrective action.  *See* Commission's Response, ECF No. 33-18.

From Mosleh's perspective, Messac and Howard engaged in discriminatory and retaliatory conduct against him in the wake of his grievances, his complaints about pay discrimination, and his termination as acting associate dean.  Mosleh contends that he suffered unlawful discrimination when Howard paid him less than comparable peers, and when Howard declined to make him Department Chair on the basis of his race and national origin.  *See generally* Compl.  Mosleh further argues that he suffered unlawful retaliation when Howard (1) removed him as acting associate dean; (2) removed him as the ASEE campus representative; (3) failed to select him as Department Chair; (4) denied a sabbatical request; (5) assigned him to teach particular courses and gave him a heavy workload; (6) failed to pay him a stipend in spring 2017; (7) refused to include him in graduate program activities; and (8) took action against graduate students under his supervision.  *See generally id.*

On April 5, 2017, Mosleh filed a lawsuit against Howard in the Superior Court for the District of Columbia.  *See* Superior Court Complaint, ECF No. 8-7.  On November 21, 2018, Mosleh voluntarily dismissed that lawsuit.  *See* Pl.'s Opp'n at 2 n.1.  Shortly before Mosleh's

voluntary dismissal, on or about November 14, 2018, the Parties executed a Tolling Agreement that served to "preserve [Mosleh's] ability to continue claims that that have already been filed [in the Superior Court case] and to preserve other claims that are still within a statute of limitations." *See* Tolling Agreement, ECF No. 33-21 at 2; Email from Mosleh's Lawyer, ECF No. 33-95 at 8.

Mosleh then filed this lawsuit. *See* Compl. On February 27, 2020, the Court dismissed two of Mosleh's breach-of-contract claims (Counts III and IV) but permitted Mosleh's claims under the District's Human Rights Act for unlawful discrimination (Count I) and unlawful retaliation (Count II) to proceed. *See id.* The Court also determined that Mosleh's discrimination claims are "limited to alleged acts of discrimination occurring since April 5, 2016" due to the one-year statute of limitations under District law. *See id.* at 8.

## II.   The Summary Judgment Standard

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute about a material fact does not exist unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party has met its burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Though courts "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252. In other words, "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Id.*

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). Yet "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Although "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Baylor v. Powell*, 459 F. Supp. 3d 47, 53 (D.D.C. 2020) (quotation omitted). As "conclusory allegations" and "unsubstantiated speculation" will not suffice to create genuine issues of material fact, "[s]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." *Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 143, 149 (D.D.C. 2020) (quotation omitted).

### III.    Mosleh's Discrimination Claims under the District's Human Rights Act

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's "race" or "national origin." 42 U.S.C. § 2000e-2(a)(1). The District's Human Rights Act uses similar language to prohibit discrimination on the account of an individual's "race" or "national origin." D.C. Code § 2-1402.11(a)(1); *Mawakana v. Bd. of Trustees of Univ. of the D.C.*, 926 F.3d 859, 863 (D.C. Cir. 2019). Given that both statutes use near-identical language, courts evaluate a claim brought under the District's Human Rights Act pursuant to the jurisprudence built up around Title VII. *See Thomas v. D.C.*, 209 F. Supp. 200, 204 (D.D.C. 2016).

8

An employee can prove unlawful discrimination with either direct or indirect evidence. *See Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 187 (D.D.C. 2018).  An employee has direct evidence of unlawful discrimination in circumstances where, for example, "the employer overtly refer[s] to the employee's protected trait when making an unfavorable employment decision."  *Id.* (quotation omitted).  A clear link must exist between the evidence of discrimination and the unfavorable employment decision for the evidence to constitute direct rather than indirect evidence of discrimination.  *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011); *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (quotation omitted) ("Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*.").  Direct evidence of discrimination, rare as it is, will often necessitate a jury trial.  *Vatel*, 627 F.3d at 1247.

Where the employee does not have direct evidence of unlawful discrimination, the employee must as a threshold matter make a prima facie case of unlawful discrimination.  *See Deppner*, 325 F. Supp. 3d at 187.  To do so, the employee must show that:  (1) the employee is a member of a class protected under the statute; (2) the employee suffered a cognizable adverse employment action; and (3) the adverse action generates an inference of discrimination.  *Thomas*, 209 F. Supp. at 204.

At the summary judgment stage, however, if an employer has "asserted a legitimate, non-discriminatory reason for the challenged decision," the court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case."  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008).  The court should instead "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the employee on the basis of race, color, religion, sex, or national origin?"

*Id.* at 494; *see also Ball v. George Washington Univ.*, No. 17-CV-507 (DLF), 2019 WL 1453358,

at *8 (D.D.C. Mar. 31, 2019); *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019)

("*Brady*'s suggested preference for merits resolution on the third prong is just that—a suggestion,

which the District Court should follow only when feasible."); *Taylor v. Solis*, 571 F.3d 1313, 1320

(D.C. Cir. 2009) (noting that the "court can resolve that [central] question in favor of the employer

based either upon the employee's failure to rebut its explanation or upon the employee's failure to

prove an element of her case"); *Cox v. Nielsen*, No. 1:16-CV-01966 (TNM), 2019 WL 1359806,

at *10 (D.D.C. Mar. 26, 2019) (noting that "a plaintiff must still establish certain threshold issues,

even if they are part of the prima facie case, in order to survive a motion for summary judgment").

To answer the central question at the summary-judgment stage, courts assess whether

evidence exists "from which a reasonable jury could find that the employer's stated reason for the"

adverse employment action amounts to "pretext."  *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d

354, 358 (D.C. Cir. 2013); *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir.

2015).  Demonstrating "that the employer is making up or lying about the underlying facts that

formed the predicate for the employment decision," such as poor performance or workplace

misconduct, represents one way for an employee to show that the proffered reason was pretextual.

*Brady*, 520 F.3d at 495.  Regardless how the employee attempts to show pretext, courts have a

duty to smoke out "pretextual employer rationales" and "to discern whether prohibited

discrimination may be a real reason for the challenged action."  *Burley*, 801 F.3d at 296.

As noted above, Mosleh claims that Howard discriminated against him on the basis of his

race and national origin when it paid him a lower salary relative to comparable peers and when it

declined to select him in late 2016 as the Department Chair.  *Id.*  For the reasons explained below, a reasonable jury could not find in Mosleh's favor based on the record before the Court.

### A.  Mosleh's Claim of Pay Discrimination

To state a prima facie case of pay discrimination, a plaintiff must show membership in a protected class; that he performed work substantially equal to that of similarly situated employee; and that the fellow employee received compensation at higher rate.  *Perry v. Clinton*, 831 F. Supp. 2d 1, 13 n.7 (D.D.C. 2011) (citing *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999)); *see also Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 374 (D.C. Cir. 2010).  For a fellow employee to be similarly situated, a plaintiff must show that "all" of the "relevant employment aspects" of the comparator are "nearly identical" to the plaintiff.  *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC*, 57 A.3d 943, 956 (D.C. 2012) (quotation omitted).  "Differences in job title, responsibilities, education, experience, and work record can be used to determine whether two employees are similarly situated."  *McFarland v. George Washington Univ.*, 935 A.2d 337, 353 (D.C. 2007).  And courts often conclude that employees with greater responsibility are not similarly situated to those without a comparable level of responsibilities.  *See Hollins v. Fed. Nat. Mortg. Ass'n*, 760 A.2d 563, 578 (D.C. 2000); *Johnson v. D.C.*, 225 A.3d 1269, 1280 (D.C. 2020) (quotation omitted) ("An employee is considered similarly situated to the plaintiff for the purpose of showing disparate treatment when all of the relevant aspects of the plaintiff's employment situation are nearly identical to those of the other employee.").[1]

---

[1] In its prior Memorandum Opinion resolving Howard's motion to dismiss, *see* Mem. Op., the Court concluded that the continuing violation doctrine does not apply under District law to cases of discriminatory pay, *id.* at 6, and thus Mosleh is limited to pursuing relief for pay discrimination starting one year before initiating suit—that is, for alleged acts of discrimination occurring after April 5, 2016.  *Id.*  The issue, then, is whether Mosleh was, on account of his race or national origin, paid at a rate lower than his similarly situated colleagues for performing substantially the same work at any point from April 5, 2016 to present.

Howard argues that Mosleh has failed to establish a prima facie case in connection with claim of pay discrimination.[2]  According to Howard, it sets salary levels for its professors pursuant to a variety of considerations, including academic judgments about each professor's "teaching, research, and service."  Deposition of Anthony Wutoh ("Wutoh's Deposition"), ECF No. 33-31 at 12.  A professor's performance in administrative roles, including administrative roles such as associate deanships, factors into overall compensation, too.  *See* Wutoh Declaration at ¶ 10.  With that background in mind, the Court concludes that Mosleh has not shown that he is nearly identical to the professors he has identified as comparators who received higher pay than him from April 5, 2016 to present.  *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (noting the requirement that one must "demonstrate that all of the relevant aspects of [his] employment situation were 'nearly identical' to those" of comparators).

Mosleh identifies Moses Garuba and Kimberly Jones as his salary comparators.  *See* Compl. ¶ 3.  All three became full professors in 2009, but Garuba and Jones were not similarly situated to Mosleh when they received salary increases in late 2016 because they were associate deans at that time, while Mosleh was not.  *See* Messac's Deposition at 25 (noting that Garuba was appointed an acting associate dean effective July 1, 2016); Messac's Declaration at ¶ 38 (noting that Jones became an acting associate dean in August 2016); *see also Palmer v. Indiana Univ.*, No. 119CV04610JMSMJD, 2021 WL 914030, at *28 (S.D. Ind. Mar. 10, 2021) ("[T]he Court finds that Professor Gildea is not an appropriate comparator.  Professor Gildea held an administrative

---

[2] The Court acknowledges that *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), states that courts should skip the analysis of the plaintiff's prima facie case and ask if an employer has "asserted a legitimate, non-discriminatory reason for the challenged decision," *id.* at 493.  But the "*Brady* rule does not, however, apply in every case.  As the *Brady* court noted, the question of whether the plaintiff has established a prima facie case is almost always irrelevant, . . . it is not always irrelevant." *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 258 (D.D.C. 2017) (quotation omitted); *Felicia Kelso v. Dennis McDonough*, No. 1:19-CV-0722 (CJN), 2021 WL 3856614, at *4 (D.D.C. Aug. 30, 2021).

position during those three years, and Professor Palmer did not.").  Moreover, Barbara Lee, an expert for Howard, testified, after conducting a detailed review, that in her opinion both Garuba and Jones received higher compensation than Mosleh for legitimate, merit-based reasons and that neither were similarly situated to Mosleh.  *See* Barbara Lee's Deposition, ECF No. 33-35 at 10. While Mosleh tried to rebut that testimony with his own expert, that expert acknowledged that he "did not make a point-by-point comparison between Mosleh and the others," and that "Jones and Garuba . . . have been appointed to administrative positions that provided, that enabled them to carry out administrative service." Robert Kreiser's Deposition ("Kreiser's Deposition"), ECF No. 36-17 at 11.  Because Mosleh has failed to identify sufficiently comparable comparators, he cannot make out a prima facie claim of pay discrimination.

Mosleh pushes back, contending that his comparators extend to all the full professors in his department rather than just Garuba and Jones.  *See* Def.'s Mot.  But a plaintiff cannot substitute new allegations at the summary-judgment stage for those made in the complaint.  *See Simpkins v. Jacobs Engineering Group, Inc.*, Civ. No. 1:19-cv-0447 (CJN), 2021 WL 5182098, at *6 (D.D.C. Sept. 29, 2021) (noting that "a plaintiff cannot amend its pleadings in responding to a motion for summary judgment," and that "brand-new theory of liability cannot defeat summary judgment").  In any event, even if the Court were to consider these new comparators, Mosleh has proffered no evidence that would tend to establish that he was nearly identical to any other professor in his department.  The testimony of Sonya Smith is not to the contrary.  It simply does not suggest that Mosleh was "nearly identical" in "all relevant aspects" to professors who were paid a higher salary. *See* Sonya Smith's Deposition ("Smith's Deposition"), ECF No. 36-16.

Mosleh also points to a salary table showing the salary history for full professors in his department from 2015 to 2020.  *See* Salary Table from 2015 through 2020, ECF No. 36-47.  As

Mosleh sees it, the salary table shows that the College compensated him less than his colleagues from 2015 through 2020, "notwithstanding his tenure at [Howard] and his long list of contributions to the" College.  Pl.'s Opp'n at 37.  The salary table, however, does not support Mosleh's claim because the table does not compare Mosleh's record of service with the other professors listed on the table.  That lack of comparison proves fatal.  *See Esters v. Nielsen*, No. 1:18-CV-02547 (CJN), 2021 WL 722883, at *5 (D.D.C. Feb. 24, 2021) (noting that "where a plaintiff relying on comparator evidence fails to produce 'evidence that the comparators were actually similarly situated to [him], an inference of falsity or discrimination is not reasonable,' and summary judgment is appropriate").

Howard also argues that even if Mosleh could show that he was nearly identical to professors who were paid more than him—that is, even if he could make out a prima facie case— he has presented no evidence from which a reasonable jury could find that Howard's stated non-discriminatory reasons for his pay after April 2016 were pretextual.  According to Howard, Messac awarded certain professors, like Jones and Garuba, with pay increases because of their administrative service.  *See* Messac's Deposition at 49–50.  In particular, Messac explained that he increased the salary of Jones and Garuba because he wanted to reward "high-performing" administrators.  *See id.* at 15.  Mosleh has presented no evidence suggesting that Messac's explanation is pretextual.  What's more, at Messac's recommendation, Mosleh received an above-average salary increase for 2017, 2018, and 2019.  *See id.* at 14.  And Mosleh has advanced no facts to show that Messac or Howard's leadership considered Mosleh's race or national origin in setting his salary.

Mosleh contends that he has direct evidence of discrimination.  Recall that "[d]irect evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact

in question without any need for inference.  Such evidence includes any statement or written document showing a discriminatory motive on its face." *Walden v. Patient-Centered Outcomes Rsch. Inst.*, 304 F. Supp. 3d 123, 133 n.2 (D.D.C. 2018) (quotation omitted).  And the evidence must "itself show[ ] . . . bias in the employment decision."  *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 322 (D.D.C. 2018) (quotation omitted).  Direct evidence of discrimination does not arise often.  *Walden v. Patient-Centered Outcomes Rsch. Inst.*, 304 F. Supp. 3d 123, 133 n.2 (D.D.C. 2018) (quotation omitted).

Mosleh points to Messac's comments referencing his Iranian nationality in connection with his trouble using English grammar in a proper fashion.  *See* Mosleh's Deposition at 15.  One might consider Messac's comments insensitive.  But "stray remarks in the workplace and statements by decision makers that are unrelated to the decision-making process are not considered sufficient to satisfy the direct evidence burden."  *Little v. District of Columbia Water and Sewer Auth.*, 91 A.3d 1020, 1025 (D.C. 2014); *Ukwuani v. District of Columbia*, 241 A.3d 529, 544 (D.C. 2020) (noting that while the supervisor's comments "may have been rude or worse . . . there is no evidence showing that [supervisor] meant them as a racially or ethnically charged insult or that the comments were motivated by prejudice").  Here, Messac's comments were in no way linked to Mosleh's alleged disparate salary.  They are far too thin a reed to rebut Howard's legitimate non-discriminatory reason for Mosleh's salary levels.

Mosleh also leans on *Coward v. ADT Sec. Sys., Inc.*, 140 F.3d 271 (D.C. Cir. 1998) as support for his position.  There, an African American employee claimed that his employer paid him less than his white counterparts.  *Id.* at 273.  The Court of Appeals held that the district court had incorrectly granted summary judgment to the employer because sufficient evidence existed to create "a genuine factual issue about whether similarly situated white employees earn more than"

Coward.  *Id.* at 275.  In doing so, the Court of Appeals explained that "[i]dentifying some similarly situated employees-even one-establishes a prima facie case."  *Id.* at 276.  But the Court of Appeals also explained that, on remand, summary judgment might be appropriate based on the company's "proffered non-discriminatory reason" for the lower salary and whether the plaintiff could "rebut[]" the company's rationale.  *Id.*  That is precisely the situation here.  Not only has Mosleh failed to identify a similarly situated coworker, but he has failed to point to evidence suggesting that Howard's proffered non-discriminatory reasons for his lower pay are pretextual.

### B.  Mosleh's Claim of Discrimination regarding the Position of Department Chair[3]

Mosleh also alleges that Howard discriminated against him when it removed him from "consideration for a promotion as Chair of the Department of Mechanical Engineering."  Compl. ¶ 69.  Howard argues that it has presented a legitimate, non-discriminatory reason for its decision, and that Mosleh has not cast sufficient doubt on Howard's rationale to give rise to an inference of pretext.  A more elaborate explanation of the facts is relevant to assess this question.

In the summer of 2016, Horace Whitworth resigned from serving as acting Department Chair, which lead Messac to assume the role on an interim basis.  *See* Messac's Declaration at ¶ 43.  The College then issued a solicitation for the vacant position.  *See* Owolabi's Declaration at ¶ 7.  Thirteen applications were submitted, including Mosleh's.  *Id.*

The Howard Faculty Handbook provides that a search committee must be established to fill a Department Chair vacancy.  *See* Howard University Faculty Handbook, ECF No. 33-82 at

---

[3] Howard argues that the Court has already dismissed Mosleh's claim of unlawful discrimination with respect to the failure to select Mosleh as the Department Chair.  *See* Mem. Op. at 6 n.2.  The Court stated in its Memorandum Opinion that "Mosleh initially asserted discriminatory conduct based on both disparate pay and the denial of promotions for which he was entitled, but he conceded at oral argument that the denial of the promotion might be more properly considered as part of the retaliation count."  *Id.*  It makes no difference whether Mosleh conceded his discrimination claim in relation to Howard's failure to select him as the Department Chair because such a claim fails for the reasons stated above.

12.   The dean appoints the chair of the committee, and the faculty decides on the remaining members.  *Id.*  The search committee then makes a recommendation to the dean, who forwards his own recommendation together with the search committee's recommendation to Howard's President for a final decision.  *Id.*

Faculty members appointed Gbadebo Owolabi, Hazel Edwards, Claudia Marin-Artieda, Hyung Bae, Emmanuel Glakpe, Sonya Smith, and a Howard student to the search committee.  *See* Owolabi's Declaration at ¶ 7.  Messac selected Edwards to serve as chair.  *See* Messac's Deposition at 43.  Messac later replaced Edwards with Glakpe after Edwards stepped down for health-related reasons, reducing the members of the committee from seven to six.  *Id.*

The search committee developed a rubric to score each applicant.  *See* Gbadebo Owolabi's Deposition ("Owolabi's Deposition"), ECF No. 33-39 at 14.  The rubric required each search committee member to submit a numerical score of one through four in eight separate categories.  *Id.; see also* Emmanuel Glakpe's Email, ECF No. 36-49 at 3.  A score of one equated to below-average, whereas a score of four equated to outstanding.  *Id.* at 3.  The committee then sent the top five candidates based on the numerical scores to Messac.  *See* Owolabi's Deposition at 14.  The committee did not score Mosleh in the top five.  *Id.*; *see also* Messac's Declaration at ¶ 44.

From the list of five finalists, Messac recommended Nadir Yilmaz for the position.  *See* Messac's Declaration at ¶ 48.  Born in Turkey and of Turkish descent, Yilmaz became a professor at Howard in 2017.  *See* Nadir Yilmaz's Declaration ("Yilmaz's Declaration"), ECF No. 33-69 at ¶¶ 2–4.  He has published close to 100 peer-reviewed publications and has obtained several notable research grants.  *See* Nadir Yilmaz's Deposition, ECF No. 33-37 at 6.  Based in large part on Yilmaz's academic track record, Howard's President appointed Yilmaz as Department Chair.  *See* Yilmaz's Declaration at ¶ 4.

In March 2017, Mosleh filed a grievance with Howard's Faculty Grievance Commission alleging multiple violations with the search process. *See* Mosleh's Grievance, ECF No. 33-17.[4] In particular, Mosleh alleged that (1) the reduction from seven members to six members violated the Faculty Handbook; (2) the appointment of Glakpe as the replacement chairperson was inconsistent with past precedent, where the chair of the search committee did not hold the position (even on an acting basis) of the vacancy being filled; (3) Owolabi and Glapke manipulated Mosleh's evaluation scores to ensure that he did not finish in the top five; and (4) the search committee violated Mosleh's right to a fair and impartial hiring practice. *Id.* at 5–6.  The Commission agreed that the reduction from seven to six members violated the Faculty Handbook, but stated that "[w]hile [that] violation . . . appears to be credible, there is no recommendation that the [Commission] can reasonably make to address this issue that will impact the outcome of the selection process."  .  *See* Commission's Response, ECF No. 33-18; *Id.* at 3.  As a result, the Commission did not take any further action on Mosleh's grievance.  *Id.*

Based on the foregoing, the Court concludes that Howard has presented a legitimate, non-discriminatory reason for its decision not to promote Mosleh to the position of Department Chair. In particular, the search committee recommended five other applicants other than Mosleh because of their qualifications and life experiences.  And the search committee based its recommendation on its own non-discriminatory evaluation of the candidates, which resulted in Mosleh finishing outside of the top five.

---

[4] The members of the Commission include tenured faculty members of Howard excluding administrators and chairs of departments. *See* Howard University Faculty Handbook, ECF No. 33-82 at 18.  After submission of a grievance, the Commission has 30 days to determine whether to accept the grievance for investigation or dismiss it.  *Id.*  If the Commission is unable to resolve a grievance informally, it proceeds with a formal hearing before a hearing panel of four panelists, two selected by each party, and the Commission chair.  *Id.* After the formal hearing, the hearing panel reports its findings in a written report, which gets sent to the President of Howard for a final decision.  *Id.*

Mosleh argues that Owolabi disregarded the voting rules when he gave Mosleh a score of zero in two of the eight categories.  *See* Pl.'s Opp'n at 43.  Those scores, as Mosleh sees it, knocked him out of the top five candidates and prohibited him from advancing to the next round.  *Id.*; *see also* Scoring Table, ECF No. 36-50.  Mosleh further contends that Owolabi, in cahoots with Glakpe, manipulated the scores to produce a scripted outcome.  And Mosleh claims that Owolabi and Glakpe had both made negative remarks toward Iranians in the past, generating an inference that they worked together to torpedo his chances because of his Iranian nationality.  *See* Mosleh's Deposition at 18 (claiming that Glakpe stated during a department meeting and in reference to two students from Iran who had been admitted to begin in the fall 2016 semester that:  "Why we have Iranian students, why do we have graduate – why do we – why do we get these graduate Iranian students?"); *see also* Gbadebo Owolabo's Memorandum, ECF No. 33-40 at 3 (bolding the word "Iranian" in a memorandum Owolabo sent to the provost in July 2017, describing several of Mosleh's Iranian graduate students).

Mosleh has a point.  Owolabi does appear to have disregarded the voting rules by giving Mosleh scores of zero in two categories rather than at least scores of one.  But Mosleh must do more than demonstrate an anomaly in the voting.  He must demonstrate that that evidence is sufficient for a jury to conclude that Howard's proffered reasons for its decision are pretextual.  Here, Mosleh's argument falters.  Owolabi's stray remarks (really just a bolded word) do not in this scenario support an inference of discrimination all its own.  *See Jung v. George Washington Univ.*, 875 A.2d 95, 111 (D.C. 2005) (noting that "not every comment reflecting discriminatory attitudes will support an inference that it was a factor motivating the adverse decision").[5]

---

[5] Any suggestion that Glakpe and Owolabi's remarks in reference to Iranians constitute direct rather than indirect evidence of discrimination is to no avail.  None of the comments relate to Mosleh or the vacant position of Department

Mosleh has also not pointed to evidence in the record to suggest that Owolabi colluded with Glakpe to sink Mosleh's candidacy.  In fact, the contrary appears true.  The record indicates that the search committee declined to advance Mosleh because the committee preferred other candidates based on their attributes and experiences.  Plus, the fact that Howard's President selected Yilmaz for the position weighs against Mosleh's claim.  Recall that Yilmaz hails from Turkey (a predominately Muslim country bordering Iran) and is of Turkish descent.  Yilmaz's selection is, to some extent at least, inconsistent with Mosleh's claim of discrimination.  *See Jean-Gilles v. County of Rockland*, 195 F. Supp. 2d 528, 533 (S.D.N.Y. 2002) (noting that "the fact that another minority was made commissioner does tend to weaken plaintiff's claim" of discrimination but "does not foreclose[]" it); *Mohamed v. McLaurin*, 390 F. Supp. 3d 520, 555 (D. Vt. 2019).

Mosleh challenges the Court's conclusion from another direction, contending that the "documentary evidence and other testimony in this case . . . shows that [] Mosleh was not only qualified for the position of Chair of the Department, but that he was the most, if not one of the most qualified, candidates for the position."  Pl.'s Opp'n at 42.  To support that view, Mosleh argues that "he was the only internal candidate to apply," and that his many years of service should have been recognized and rewarded.  *Id.*  It is true that "disparity in qualifications, standing alone, can support an inference of discrimination."  *Smith v. Swick & Shapiro, P.C.*, 75 A.3d 898, 907 (D.C. 2013) (quotation omitted).  But such an inference can be drawn "only when the qualifications gap is great enough to be inherently indicative of discrimination'—that is, when the plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified' than the successful candidate."  *Id.*  Mosleh has failed to proffer evidence demonstrating that he

---

Chair.  Plus, the remarks without more do not rise to the level of direct evidence of discrimination.  *See Jung*, 875 A.2d at 111.

outmatched the finalists based on qualifications.  In particular, Yilmaz had previous experience as an associate department chair for two and a half years at his prior university, while Mosleh had no such experience and only served as acting associate dean for less than two months.  *See* Yilmaz's Declaration at ¶ 3.  In short, there exists insufficient evidence in the record from which a reasonable jury could conclude that Mosleh was substantially more qualified than (or even as qualified as) Yilmaz or the other candidates that advanced past the first round.

### IV.   Mosleh's Retaliation Claims under the District's Human Rights Act

Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice" by the statute.  *See* 42 U.S.C. § 2000e-3(a).  The District's Human Rights Act makes it unlawful to "retaliate against" any person "on account of" that person "having exercised" or "having aided or encouraged any other person in the exercise . . . of any right granted" under the Act.  *See* D.C. Code § 2-1402.61(a). Courts analyze claims of retaliation under the District's Human Rights Act pursuant to "the same framework as those under Title VII."  *Bess v. D.C.*, No. CV 19-3152 (JEB), 2021 WL 4819882, at *3 (D.D.C. Oct. 15, 2021); *McCain v. CCA of Term., Inc.*, 254 F.Supp.2d 115, 124 (D.D.C. 2003) ("The elements of a retaliation claim under the DCHRA are the same as those under the federal employment discrimination laws.").

To demonstrate retaliation, a plaintiff must show that he engaged in protected activity; that his employer subjected him to an adverse employment action; and that a causal link connects the protected activity with the adverse action.  *See Squires v. Gallaudet Univ.*, No. CV 20-1348 (ABJ), 2021 WL 4399554, at *8 (D.D.C. Sept. 27, 2021).  Consistent with Title VII, an employer's adverse action can be actionable under District law "if it would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Propp v. Counterpart Int'l*, 39 A.3d 856,

863 (D.C. 2012) (quotation omitted).  When it comes to causality, a split of authority exists in this District as to whether claims of retaliation under the District's Human Rights Act are subject to a "but for" causation standard, as are Title VII retaliation claims, *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), or are instead subject to the "substantial factor" standard test for discrimination claims under the District's Human Rights Act, *McFarland*, 925A.2d at 346.

Courts employ the same burden-shifting framework used for retaliation claims as the one used for discrimination claims.  *See Propp*, 39 A.3d at 862; *Moss v. Hayden*, Civ. No. 18-470 (JEB), 2020 WL 4001467, at *3 (D.D.C. July 15, 2020).  Once the employee establishes a prima facie case of retaliation, "the burden shifts to the employer to identify the legitimate, . . . non-retaliatory reason on which it relied in taking the complained-of action." *Singh v. Am. Ass'n of Retired Persons, Inc.*, 456 F. Supp. 3d 1, 6 (D.D.C. 2020) (quotation omitted).  "If the employer cannot provide an actual, legitimate reason for the action, then the plaintiff is entitled to judgment." *Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 143 (D.D.C. 2017).  But where the employer asserts a legitimate, non-retaliatory reason for the challenged action, "the only relevant inquiry is whether the employee has put forth sufficient evidence for a reasonable jury to conclude that the employer's proffered explanation is a mere pretext and the employer intentionally discriminated or retaliated against the employee." *Id.*  The defendant's motion for summary judgment must be granted if the plaintiff fails to "produce sufficient evidence that would discredit [the employer's proffered explanation] and show that the actions" was retaliatory.  *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008).

### A.  Mosleh's Retaliation Claim based on Howard Removing him as Acting Associate Dean

Mosleh claims that Howard's decision to remove him from the position of acting associate dean constituted unlawful retaliation.  Compl. ¶ 25.  Howard, however, has presented a legitimate, non-retaliatory reason for this decision.  And Mosleh has not cast sufficient doubt on Howard's rationale to give rise to an inference of pretext.

In May 2016, Messac named Mosleh as the acting associate dean of the College.  *See* Compl. ¶¶ 4, 13.  Although Mosleh did not formally take the reins until July 1, Messac had Mosleh complete numerous tasks beginning in May.  *Id.* ¶ 14.  After starting work as acting associate dean, Mosleh learned that he had been awarded a new research grant through The Boeing Company and forwarded the news to Messac.  *Id.* ¶ 16.  According to Mosleh, Messac, soon after learning of the Boeing grant, told him that his summer payment for completing clerical tasks should come from the grant, and not from College funds.  *See* Mosleh's Deposition at 31.  Mosleh protested on the grounds that it would be improper for him to be paid for doing the work of a dean from the Boeing funds rather than from College funds.  *Id.*

Toward the end of the summer (a couple months into Mosleh's tenure as acting associate dean), Mosleh complained to Messac about his workload and accused Messac of unethical conduct in relation to the Boeing grant.  In particular, Mosleh emailed Messac that the "stream of tasks for [him], including completely unrelated ones to the research and graduate education, come[] via text, calls, and email from the early morning to the late night.  And, often instant actions and replies are requested!"  *See* Email from August 12, 2016, ECF No. 33-14 at 2.  Mosleh also complained that his workload left him with "no time whatsoever during the week and sometimes during the weekend to fulfill my obligations to my research contracts."  *Id.*  Mosleh concluded his email to Messac with the following statement regarding the use of Boeing grant funds to pay Mosleh's

summer salary: "While the complete fixation on obtaining the result is understandable, there should be a consideration of the required logistic and the attention not to force others to break the ethical standards such as those required in conduct of sponsored research." *Id.* at 3.  Messac responded, less than an hour later, that "the following comments are strongly inappropriate: . . . 'the attention not to force others to break the ethical standards such as those required for research.'" *Id.* at 2.

About a week later, after a meeting between Messac and Mosleh at which Messac stated to Mosleh that "your email questioned my integrity," *see* Mosleh's Deposition at 34, Messac announced that Jones would replace Mosleh as acting associate dean, *see* Messac's Declaration at ¶ 38.  In an email sent to his colleagues shortly thereafter, Messac thanked Mosleh "for his many contributions as Acting Associate Dean."  *See* Email from August 16, 2016, ECF No. 33-49 at 2.

Howard argues, and Messac testified in his deposition, that Messac decided to replace Mosleh with Jones in part because Mosleh had demonstrated an inability to manage his administrative, research, and teaching responsibilities.  *See* Messac's Deposition at 41.  What's more, the removal of Mosleh occurred just days after he insinuated that Messac had questionable ethics.  Mosleh even acknowledged to his own expert that Messac had expressed his "unhappiness with the accusation."  Kreiser's Deposition at 10.

Mosleh tries to cast doubt upon this explanation.  He claims that he mentioned his low salary to Messac in the days and months before Messac removed him from the position.  According to Mosleh's version of events, he met with Messac in late August to discuss his issues with the Boeing funds and his ongoing salary concerns.  *See* Mosleh's Deposition at 34.  After the tense discussion, Mosleh claims that he returned to his office to find Messac's email informing him of his removal.  *See* Pl.'s Opp'n at 47.  As Mosleh sees it, a jury could reasonably conclude that

Messac removed Mosleh from the position as acting associate dean because of his complaints regarding his pay (and that the complaints regarding his pay involved claims of discrimination). *Id.*

The Court disagrees. The Court noted in its earlier Memorandum Opinion that "Mosleh faces a significant hurdle of proving that [the] allegedly adverse actions stemmed from his discrimination grievances and not his opposition to the Boeing billing charges." Mem. Op. at 10. Several of Mosleh's colleagues testified that Mosleh himself attributed his removal from the position of acting associate dean to his complaints about the Boeing funds. In response to being asked whether "Mosleh [told] you that he was removed [as associate dean] because . . . he had made complaints of discrimination," Sonya Smith testified that Mosleh "said it was because of . . . what he felt were inappropriate charges to his grant." Smith's Deposition at 13. Robert Kreiser similarly testified that in his view Messac removed Mosleh "as associate dean because [Mosleh] incurred the displeasure of [ ] Messac for having accused him of engaging in unethical practices." Kreiser's Deposition at 10.

## B. Mosleh's Retaliation Claim based on Howard Replacing him as ASEE Campus Representative

Mosleh alleges that Howard retaliated against him when it "stripped" him "of his title of Campus Representative for the American Society for Engineering Education." Compl. ¶ 5. Howard has presented a legitimate, non-retaliatory reason for Messac's decision to remove Mosleh as ASEE campus representative: Messac believed that an associate dean should hold the position as campus representative. *See* Messac's Declaration at ¶ 42. Indeed, Messac replaced Mosleh with Jones (then, an associate dean). *Id.*

Mosleh argues that Howard's "attempt to excuse Messac's summary dismissal of Mosleh as ASEE Campus Representative, a position he himself coordinated and volunteered for, as a

business decision, is nothing but pretext for retaliation."  Pl.'s Opp'n at 49.  But Mosleh offers

next to nothing to support this argument or to cast doubt on Howard's explanation.  *See id.*  Mosleh

does argue that removal from the position qualifies as an adverse action.  But even that contention

is dubious.  The removal from an unpaid, ancillary, and voluntary position such as the ASEE

campus representative may not even count as an "adverse action" for purposes of a retaliation

claim.  *See Koch v. Schapiro*, 759 F. Supp. 2d 67, 75 (D.D.C. 2011); *Hornsby v. Watt*, 217 F. Supp.

3d 58, 66 (D.D.C. 2016).

### C.  Mosleh's Retaliation Claim based on Howard Declining to Select him as Department Chair

Mosleh alleges that Howard not only discriminated but also retaliated against him when it

removed him from "consideration for a promotion as Chair of the Department of Mechanical

Engineering."  Compl. ¶ 69.  As discussed above, Howard has presented a legitimate, non-

retaliatory reason for its decision not to promote Mosleh.  What's more, Mosleh did not contest

this argument in his brief in opposition to Howard's motion.  *See* Def.'s Reply Br. in Supp. of

Summ. J. ("Def.'s Reply"), ECF No. 40-2 at 25.

### D.  Mosleh's Retaliation Claim based on Howard Denying his Sabbatical Request

Mosleh alleges that Messac denied his September 2017 application for a paid sabbatical

for the spring of 2018 in retaliation for his engagement in protected activity.  *See* Compl. ¶¶ 47,

69.  Mosleh's claim of retaliation based on the denial of his sabbatical request runs into two

problems.  First, Howard has proffered a legitimate, non-retaliatory reason for not approving the

sabbatical.  Second, assuming Mosleh could rebut the stated reason (which he cannot), his

sabbatical claim is time barred.  Some additional background is in order to understand why.

On September 1, 2017, Mosleh applied for a one-semester sabbatical leave for the spring

2018 semester.  *See* Mosleh's Deposition at 49.  About two weeks later, Messac informed Mosleh

that the Provost and the President had not approved his request.  *See* Messac's Declaration at ¶ 60.

Soon after, Mosleh submitted a complaint to the Chair of the Faculty Grievance Commission.  *See*

Mosleh's Grievance, ECF No. 36-41.  The Commission later found "the denial of sabbatical to be

(i) arbitrary and capricious; and (ii) does not adhere to [the] 1993 Faculty Handbook provisions."

*Id.* at 2.  The Commission did not, however, make any finding of retaliation or retaliatory intent.

*Id.*

Notwithstanding these conclusions, Howard has provided a legitimate, non-retaliatory

reason for not approving Mosleh's sabbatical request.  Messac recommended against the request

for several reasons, including a faculty shortage and the cost of hiring a replacement given budget

shortfalls.  *See* Messac's Declaration at ¶ 61.  Mosleh challenges Messac's rationale, arguing that

the record and the Commission's findings reveal that Messac's decision to reject his sabbatical

application was "arbitrary and capricious" and violated the procedures outlined in the College's

Faculty Handbook.  Pl.'s Opp'n at 50.  While that may be true, Mosleh has not shown that Messac

lacked an honest belief in the non-retaliatory basis for his decision.  *See Chan Chan v. Children's

Nat'l Med. Ctr.*, No. CV 18-2102 (CKK), 2021 WL 75759, at *7 (D.D.C. Jan. 8, 2021) (quotation

omitted) ("When [e]valuating an employer's asserted reason for a discharge, [the Court] ask[s] not

whether the employer was objectively correct in discharging the employee but instead whether the

employer honestly believes in the reasons it offers.").  In other words, Mosleh has presented no

evidence to demonstrate that Messac did not honestly believe that the timing of Mosleh's request

posed insurmountable challenges.  In short, Mosleh has provided insufficient evidence from which

a reasonable jury could conclude that this explanation was a pretext for retaliation.

In any event, this claim is time-barred.  District law provides a one-year statute of

limitations for claims brought under the District's Human Rights Act.  *See* D.C. code § 2-

1403.16(a); *Cohen v. Washington Metro. Area Transit Auth.*, No. CV 21-2370 (TJK), 2021 WL 5239492, at *2 (D.D.C. Nov. 11, 2021).  This claim accrued in September 2017, but the Tolling Agreement did not toll it, as the Tolling Agreement was not executed until November 2018.  *See* Tolling Agreement, ECF No. 33-96.  Mosleh filed this lawsuit in February 2019, after the statute of limitations had already run.  *See* Compl. (filed on February 11, 2019).  And Howard preserved its statute of limitations defense when it raised that defense in its Answer.  *See* Def.'s Answer, ECF No. 19 at 17 ("Plaintiff's claims are barred in whole or part by the statute of limitations, including but not limited to (a) all claims accruing before April 5, 2016; and (b) all claims accruing before February 11, 2018 to the extent not effectively tolled by agreement.").

### E. Mosleh's Retaliation Claim based on Howard Assigning him the "Solid Mechanics Laboratory" Course

Mosleh contends that Messac engaged in unlawful retaliation when he assigned Mosleh to teach basic undergraduate courses he had never taught before, including "Solid Mechanics Laboratory."  Compl. ¶ 33.  Howard has provided a legitimate, non-retaliatory reason for this decision:  The prior instructor could not teach the class and Mosleh had the qualifications to teach it.  *See* Messac's Declaration at ¶ 44.  Indeed, it is undisputed that other faculty members were assigned to teach courses that they had not taught before and which were outside their core area of expertise.  *See* Yilmaz's Declaration at ¶¶ 17–19.  Mosleh also lacks any evidence to suggest that this decision was pretextual.

Assigning Mosleh the responsibility to teach the "Solid Mechanics Laboratory" course also likely does not count as adverse action that can support a retaliation claim.  *See Morales v. Gotbaum*, 42 F. Supp. 3d 175, 198 (D.D.C. 2014) ("increased work must be frequent or particularly onerous to be material; otherwise they are de minimis and 'trivial'"); *Walker v. District of Columbia*, 279 F. Supp. 3d 246, 262–63 (D.D.C. 2017) ("being asked to handle heavier work

responsibilities does not necessarily imply an adverse action").  Mosleh points to *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006), which states that a reassignment "with significantly different responsibilities . . . generally indicates an adverse action," *Id.* at 902.  *Holcomb*, however, involved "an extraordinary reduction in responsibilities that persisted for years." *Id.*  And the court recognized that a plaintiff's "dissatisfaction with a reassignment" is not an "adverse action." *Id.*

One other note.  Mosleh seems to argue that Howard retaliated against him when it excluded him from teaching graduate or elective courses at Howard in 2018 and 2019.  *See* Pl.'s Opp'n at 50.  But even though Mosleh disagreed with those decisions, no record evidence suggests that Yilmaz, the then Department Chair, lacked the honest belief that he had the authority to make the course reassignment under Howard's rules.  *See* Yilmaz's Declaration at ¶ 36; *see also Chan Chan*, 2021 WL 75759, at *7 (quotation omitted) ("When [e]valuating an employer's asserted reason for a discharge, [the Court] ask[s] not whether the employer was objectively correct in discharging the employee but instead whether the employer honestly believes in the reasons it offers.").  Plus, and as already mentioned, it is far from certain whether Yilmaz's decision to not assign Mosleh to teach certain courses amounts to an "adverse action." *Morales*, 42 F. Supp. 3d at 198 ("increased work must be frequent or particularly onerous to be material; otherwise they are *de minimis* and 'trivial'").

### F.  Mosleh's Retaliation Claim based on Howard Failing to Pay him a Stipend

In his Complaint, Mosleh claimed that Howard retaliated against him when it failed to pay him available stipends in spring 2017.  *See* Compl. ¶¶ 36, 43–44, 69.  Howard argued in its motion for summary judgment that it "provided legitimate, non-retaliatory reasons for not paying Mosleh two available stipends in spring 2017 – namely that he did not fulfill the conditions for the stipends (i.e., submission of a CV in a designated format) and that he did not apply for the stipends." Def.'s

Mot. at 52.  Mosleh, in his opposition brief, did not contest Howard's arguments as to why summary judgment should be granted on this claim.  *See generally* Pl.'s Opp'n.  The Court concludes that not only do the facts and the law favor Howard's position, *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 509 (D.C. Cir. 2016), but also that Mosleh has conceded his claim by failing to respond to Howard's arguments, *see Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) ("It is well established that if a [party] fails to respond to an argument raised in a motion for summary judgment it is proper to treat that argument as conceded."); *Harris v. Trustees of Univ. of D.C.*, No. 1:19-CV-02915 (TNM), 2021 WL 4399552, at *11 (D.D.C. Sept. 25, 2021) ("[Mosleh's] brief at summary judgment does not respond to the University's explanation, so [he] concedes it.").[6]

---

[6] The Court notes that language from *Winston & Strawn, LLP v. McLean*, 843 F.3d 503 (D.C. Cir. 2016) can be read for the proposition (often taken out of context) that "[u]nder the Federal Rules of Civil Procedure, a motion for summary judgment cannot be 'conceded' for want of opposition." *Id.* at 505; *see also id.* (underscoring that the "District Court must always determine for itself whether the record and any undisputed material facts justify granting summary judgment").  That ruling, however, "arose in the context of a case in which the district court exercised its discretion under the Local Rules to treat a summary judgment motion as conceded when the non-moving party *failed to file any opposition at all*." *Dutton v. U.S. Dep't of Just.*, 302 F. Supp. 3d 109, 126 n.6 (D.D.C. 2018) (emphasis added).  Here, by contrast, Mosleh filed an opposition brief yet failed to respond to several of Howard's arguments specific to certain claims.  As a result, the Court does not believe the limitation from *Winston & Strawn* applies to this situation.  *See, e.g., Rojas-Vega v. United States Immigr. & Customs Enf't*, 302 F. Supp. 3d 300, 309 (D.D.C. 2018).  Instead, the "failure to oppose a basis for summary judgment constitutes waiver of that argument," because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment.  *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir.), *cert. denied*, 141 S. Ct. 894 (2020); *Ervin v. Sprint Commc'ns Co. LP*, 364 F. App'x 114, 117 (5th Cir. 2010) (quoting *Vaughner v. Pulito*, 804 F.2d 873, 877 n.2 (5th Cir.1986)) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal."); *Ogwo v. Miami Dade Cty. Sch. Bd.*, 702 F. App'x 809, 811 (11th Cir. 2017).

It is also not clear how even a limited reading of *Winston & Strawn*—*i.e.*, that a district court cannot treat a summary judgment motion as conceded when the non-moving party fails to file any opposition at all—is reconcilable with the plaintiff's burden of assuring the court that a case-or-controversy remains live.  *See Pisciottano v. United States*, No. CV 17-1138 (DLF), 2018 WL 834237, at *1 (D.D.C. Jan. 29, 2018); *Flast v. Cohen*, 392 U.S. 83, 95 (1968) (noting that the words cases and controversies "limit the business of federal courts to questions presented in an adversary context").  Plus, courts often utilize Federal Rule of Civil Procedure 41(b) to dismiss an action or claims because the plaintiff failed to pursue the action or the claims.  Fed. R. Civ. P. 41(b) ("If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it."); *Elgabrowny v. Cent. Intel. Agency*, No. 17-CV-00066 (TSC), 2021 WL 4988992, at *2 (D.D.C. Oct. 27, 2021).

### G.  Mosleh's Retaliation Claim based on Howard's Refusal to Include him in Graduate Program Activities

In his Complaint, Mosleh also claimed that Howard retaliated against him when it removed him as an examiner for the spring 2018 Ph.D. candidacy examination, when it "denied [him] access to information regarding the graduate program activities," and when it failed to assign him to teach particular graduate courses.  *See* Compl. ¶¶ 51, 55, 69.  Howard argued in its motion for summary judgment that Mosleh "and another professor were excused as examiners because one of the students to be examined had complained of unfair treatment by both of them."  *See* Def.'s Mot. at 53.  And Howard contended that "Mosleh was not assigned to teach the fall 2018 graduate course because a different student enrolled in that class had complained about Mosleh, and the Department Chair wanted to keep them separated in the interest of avoiding further conflicts between them."  *Id.*  Mosleh made no attempt to refute Howard's legitimate non-retaliatory reasons for its action, and as a result, the Court concludes that Mosleh has conceded his retaliation claim.  *See Wilkins*, 750 F. Supp. 2d at 162 ("It is well established that if a [party] fails to respond to an argument raised in a motion for summary judgment it is proper to treat that argument as conceded.").  For what it is worth, the record and the undisputed facts support Howard's contentions.  *Winston & Strawn, LLP*, 843 F.3d at 505.

### H.  Mosleh's Retaliation Claim based on Howard Failing to Provide Funding for Graduate Students under his Supervision

Mosleh also alleges that Messac denied funding to two graduate students under his supervision for retaliatory reasons.  *See* Compl. ¶¶ 49, 56; *see also* Pl.'s Resp. to Def.'s Interrog., ECF No. 12.[7]  Mosleh claims that "evidence in the case . . . points to the fact that the administration

---

[7]  In his Complaint, Mosleh suggested that Howard retaliated against one of the students under his supervision when that student did not receive an award in 2017.  *See* Compl. ¶ 56.  Mosleh has conceded that claim by failing to respond to Howard's argument in its motion for summary judgment.  *See Wilkins*, 750 F. Supp. 2d at 162 ("It is well established

denied funding to these particular students, despite citing financial concerns, and did in fact extend significant aid to other students in the Department." Pl.'s Opp'n at 52. But no evidence in the record supports his assertion. In fact, evidence supports the opposite conclusion. Students under Mosleh's supervision received stipend support as well as research grant funding. *See* John M. M. Anderson's Declaration, ECF No. 33-89 at ¶¶ 8–12.

One last note. Mosleh alleges that Howard treated graduated students under his supervision poorly because of retaliatory animus toward him. *See generally* Compl. In particular, Mosleh claims that one student under his purview received "stipulations" on his Ph.D. candidacy examination due to retaliation. Compl. ¶ 56. The evidence, however, shows that the examination committee forced the particular student under Mosleh's supervision to take additional courses because of his poor performance on written and oral examinations. *See* Owolabi's Declaration at ¶ 14. Plus, no evidence exists showing that the members of the examination committee knew of Mosleh's protected activity. *See Vogel v. District of Columbia Office of Planning*, 944 A.2d 456, 464 (D.C. 2008) ("Employer awareness that the employee is engaged in protected activity is thus essential to making out a prima facie case for retaliation.").

## V.   Conclusion

For the foregoing reasons, Howard's motion for summary judgment is **GRANTED**. And an Order will be entered contemporaneously with this Memorandum Opinion.

It is so **ORDERED**.

DATE:  March 28, 2022

CARL J. NICHOLS
United States District Judge

---

that if a [party] fails to respond to an argument raised in a motion for summary judgment it is proper to treat that argument as conceded.").